**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GOT DOCS, LLC, d/b/a IQ LOGIC, and IQL-RIGGIG, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:19-cv-06155 **JURY TRIAL DEMANDED** |
| KINGSBRIDGE HOLDINGS, LLC, | ) ) ) | Hon. Ronald A. Guzman |
| FRANK MENDICINA, | ) ) | Magistrate Young B. Kim |
| and | ) ) | |
| AMF6 SOLUTIONS LLC, | ) ) ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiffs GOT DOCS, LLC ("GOT DOCS"), d/b/a IQ Logic ("IQ Logic") and IQL-RIGGIG, LLC ("IQL-RIGGIG"), bring this action against Defendants Kingsbridge Holdings, LLC ("Kingsbridge"), Frank Mendicina ("Mendicina") and AMF6 Solutions LLC ("AMF6 Solutions"), and allege as follows:

1. This is a civil action for damages arising from Defendants' theft of IQ Logic's entire managed document services business—its trade secrets, executives, employees, accounts, books and records, sales pipeline, customers, contracts, business partners, receivables, intellectual property, and goodwill—worth tens of millions of dollars. Plaintiffs additionally bring this action to stop the ongoing, improper and unlawful use of IQ Logic's confidential

1

information and trade secrets by Mendicina, a former IQ Logic executive, and his current employer, Kingsbridge. This action also arises from IQL-RIGGIG's loss of its equity interest and monetary investment in IQ Logic due to Defendants' tortious conduct.

## PARTIES

2.     Plaintiff GOT DOCS is a limited liability company organized under the laws of the State of Nevada in 2012 with its principal place of business located at 5151 California Avenue, Irvine, California 92620.  In 2018, GOT DOCS ceased operations after Defendants stole IQ Logic's entire business and began to operate the business as "Kingsbridge Technologies."

3.     IQL-RIGGIG, formerly Riveria MCS, LLC ("Riveria"), is the sole member of GOT DOCS.  At the time when Defendants stole IQ Logic's entire business, AMF6 Solutions LLC ("AMF6 Solutions") was also a member of GOT DOCS. The sole member of AMF6 Solutions is Frank Mendicina ("Mendicina"), the former Chief Executive Officer of IQ Logic. AMF6 Solutions is no longer a member of GOT DOCS.

4.     Plaintiff IQL-RIGGIG is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 99 Park Avenue, 11th Floor, New York, New York 10016.

5.     On October 5, 2017, Riveria filed a Certificate of Amendment with the Secretary of State of Delaware changing its name to IQL-RIGGIG.

6.     Defendant Kingsbridge is a limited liability company organized under the laws of the State of Nevada with its principal place of business at 150 N. Field Drive, Suite 193, Lake Forest, Illinois 60045.

7.     The members of Kingsbridge are (i) Horace W. ("Hob") Jordan, Jr. ("Jordan"), (ii) Bruce E. Brenner ("Brenner") and (iii) Kingsbridge Holdings Aggregator, LLC ("KHA").

On information and belief, Jordan and Brenner are individuals residing in and citizens of the State of Illinois. KHA is a limited liability company organized under the State of Delaware with its principal place of business in the State of Illinois.

8.     Defendant Mendicina is an individual residing at 3 Vista Cielo, Dana Point, California 92629. Mendicina is currently the President of the Technology Division of Defendant Kingsbridge.

9.     Defendant AMF6 Solutions is a Nevada limited liability company whose Managing Member, Mendicina, resides at 3 Vista Cielo, Dana Point, California 92629.

## JURISDICTION AND VENUE

10.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 over the matters pleaded in this Complaint. The trade secret misappropriation allegation raises a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831 *et seq*. The claim for unfair competition raises a federal question under the Lanham Act, 15 U.S.C. § 1125. The claim for direct copyright infringement raises a federal question under the Copyright Act, 17 U.S.C. § 101, et seq. The Court has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367.

11.     Defendants are amenable to service of process under Fed. R. Civ. P. 4 and the Illinois long-arm statute, 734 ILCS 5/2-209, because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

12.     The Court has personal jurisdiction over Defendants Kingsbridge, Mendicina and AMF6 Solutions because each Defendant has transacted business, maintained substantial

contacts, and/or committed tortious acts in this District. Further, Plaintiffs' claims arise out of or relate to Defendants' contacts with Illinois, the forum state. Additionally, Defendants purposely availed themselves of the benefits of the forum state and reasonably anticipated being haled into court in the forum state.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant Kingsbridge resides in this judicial district and a substantial part of the events giving rise to the claims asserted herein occurred in this district at Kingsbridge's Lake Forest, Illinois headquarters, including, on information and belief, Kingsbridge and Mendicina's planning and execution of the theft of IQ Logic.

## **INTRODUCTION**

14.     IQL-RIGGIG is a private equity firm with a proven track record of growing businesses and creating enterprise value for investors. In November 2015, IQL-RIGGIG (then Riveria) acquired a majority interest in an underperforming managed document services business for a relatively low price. IQL-RIGGIG recognized that this business, "IQ Logic," had enormous untapped value, which IQL-RIGGIG's management team was able to unleash in a short amount of time by changing the company's business model, adding customers, increasing revenue, and driving greater profitability.

15.     Unfortunately, after IQL-RIGGIG had done the heavy lifting, taken the economic risk, created value and was poised to reap the economic benefits of its investment, the IQ Logic Chief Executive Officer IQL-RIGGIG inherited, Frank Mendicina, hatched a scheme with a competitor, Kingsbridge, to "take out" IQL-RIGGIG's interest in IQ Logic and enrich both Kingsbridge and himself in the process.

16.     A little more than a year later, Mendicina had left IQ Logic for Kingsbridge, along with IQ Logic's sales force, trade secrets, customers and other key elements of IQ Logic's business.  At no time during this period did Kingsbridge approach IQ Logic or IQL-RIGGIG about *legally* acquiring IQ Logic or IQL-RIGGIG's majority stake in IQ Logic.

17.     Only after it had pulled off the heist did Kingsbridge offer to pay something for IQL-RIGGIG's controlling interest in IQ Logic.  The offer was insultingly low and IQL-RIGGIG declined it.  Kingsbridge's response, referring to IQ Logic, was that it would just "take it then."

18.     This litigation followed.  Plaintiff IQ Logic seeks damages from Kingsbridge, Mendicina and AMF6 Solutions for their tortious conduct in stealing IQ Logic, claiming the business as their own and profiting at the expense of IQ Logic.  Plaintiff IQ Logic additionally brings this action to protect itself from further irreparable harm by seeking an injunction that orders Kingsbridge and Mendicina to stop using, disclosing, and misappropriating IQ Logic's confidential information and trade secrets; to cease interfering with the non-disclosure obligations of IQ Logic's former employees; and to seek restitution of Kingsbridge's unjust enrichment.  Plaintiff IQL-RIGGIG seeks damages from Kingsbridge and Mendicina for the same tortious conduct, which caused IQL-RIGGIG to lose its equity interest and monetary investment in IQ Logic and suffer related economic loss, costs and damages.

## FACTS COMMON TO ALL COUNTS

### *IQ Logic's Unique Business Model and Trade Secrets*

19.     Founded in 2012 as GOT DOCS, IQ Logic was an IT consulting company specializing in managed document services ("MDS").  MDS integrates and optimizes digital and paper workflows, reducing costs and improving productivity.

20.     With its long-term association with service and support partner Xerox®, IQ Logic utilized advanced proprietary MDS methodologies to deliver significant cost savings and measurable productivity gains to its clients.

21.     What set IQ Logic apart from the competition, among other things, was its ability to help customers optimize document workflow management through a phased approach that offered incremental return on investment at each phase.  IQ Logic customers saw significant and immediate savings throughout the process, with each phase in turn building upon the prior foundational steps.

22.     IQ Logic disrupted the traditional, opaque MDS business model that focused on hardware sales by demystifying document management processes, providing visibility into *actual* hardware usage and hidden contract costs, and creating efficient digital workflows.  In short, IQ Logic minimized customers' need for hardware *and* printing.

23.     IQ Logic had additional, differentiating factors that made it unique in the MDS industry:

  a.  Unlike major printer manufacturers, it was not financially motivated to sell unnecessary hardware, supplies or support to clients;

  b.  Unlike competitors whose sole purpose was to support the status quo sales of print-related consumables, IQ Logic's proprietary "IQ Assessment" methodology delivered customized MDS solutions for its clients' specific requirements, unique workflow and corporate culture;

  c.  Unlike consumables-driven sales businesses, IQ Logic used its proprietary "IQ Profit Management" software to audit and track the full lifecycle of

document costs, providing real-time reporting and analyses to the client's management team;

d.   Whether integrating with established enterprise software or custom-coding a solution for the client's unique environment, IQ Logic implemented best practices to achieve success for its clients; and

e.   Unlike the common practice of hidden expenses in the MDS industry, IQ Logic provided a clear view of all print-related costs from front-end supplies to back-end support.

24.   IQ Logic also produced a marketable, proprietary version of a software-as-a-service ("SaaS") content management system called "IQ Connect," which gave clients real-time insight into document management, allowed them access to all their fleet location and usage information from one place, and let them make smarter, faster decisions.

25.   IQ Connect's interactive floor maps enabled clients to see machine location and health; its "Supply Report Workflow" predicted when machines needed attention; its "Missing Machine" report kept machines online; its "Tier 1" ticketing system supported client fleet needs; its "Automatic Invoice Generation" produced quick, detailed, real-time invoices from actual usage data (not historical billing averages); and its "IQ QR Codes" allowed for seamless migration of machines from location to storage, to new location.

26.   IQ Logic spent significant time, money and resources to develop IQ Connect. IQ Connect was a developing part of IQ Logic's business analytics capability that was a key existing and expected component of the growth IQ Logic had only begun to experience.

27.   IQ Logic also designed and created a website, formerly available at www.iqlogic.com ("the IQ Logic website"). Powered with IQ Connect, the IQ Logic website

provided IQ Logic an additional competitive edge in the market. The IQ Logic website was a copyrightable work embodying the existence of intellectual production, thought and conception, fixed in a tangible medium of expression.

28.     IQ Logic spent significant time, money and resources to develop the IQ Logic website.

### *Kingsbridge's Pre-Theft Relationship with IQ Logic*

29.     Kingsbridge was one of IQ Logic's leasing partners. Kingsbridge would enter into a Master Lease Agreement with IQ Logic's customer, through which Kingsbridge would lease copiers and other equipment to the customer described in one or more Lease Schedules incorporated in the Master Lease Agreement.

30.     Through its leasing partnership with IQ Logic, Kingsbridge had access to and was aware of IQ Logic's differentiating factors and best-in-class MDS business model.

31.     For example, Kingsbridge provided leasing services to IQ Logic customer CoreLogic, Inc. ("CoreLogic") a publicly traded $3.65 billion data analytics and business intelligence company. Kingsbridge was aware that CoreLogic had a number of problems before turning its MDS function over to IQ Logic, namely:

a.  it lacked the ability to manage print services on a centralized basis;

b.  it had hidden escalation clauses in existing equipment lease contracts; and

c.  it could not figure out its cost of ownership of printing and scanning hardware.

32.     IQ Logic dramatically improved CoreLogic's MDS function by:

a.  optimizing CoreLogic's printing hardware resulting in a 60% decrease in equipment;

    b.   standardizing CoreLogic's brands and models achieving 53% total cost savings including consumables; and

    c.   installing proprietary software allowing CoreLogic to centralize service and billing and create economies of scale via IQ Connect.

### IQL-RIGGIG's Acquisition of a Majority Interest in IQ Logic

33.    In 2012, AMF6 Solutions, a California limited liability company whose sole member was Mendicina, formed an entity called GOT DOCS, LLC, d/b/a IQ Logic, with AMF6 Solutions the sole member and Mendicina as Chief Executive Officer.

34.    In 2014, Lotus Innovations Fund, L.P. ("Lotus"), a private equity fund with U.S. operations in Newport Beach, California, purchased a 40% membership interest in IQ Logic from AMF6 Solutions for cash and other valuable consideration, with AMF6 Solutions retaining a 60% interest in IQ Logic and Mendicina retaining his position as Chief Executive Officer.

35.    Shortly after purchasing a 40% interest in IQ Logic from AMF6 Solutions, Lotus purchased an additional 20% interest from AMF6 Solutions for cash and other valuable consideration, thereby increasing Lotus' ownership in IQ Logic to 60%. After the purchase, Mendicina continued as Chief Executive Officer of IQ Logic.

36.    As of November 2015, 60% of the equity interests in IQ Logic were owned by Lotus and 40% of the equity interests in IQ Logic were owned by AMF6 Solutions.

37.    At no time relevant to this Complaint did Kingsbridge own any equity in Lotus, AMF6 Solutions, or IQ Logic.

38.    On November 18, 2015, IQL-RIGGIG and Lotus entered into a Unit Purchase Agreement ("UPA") through which IQL-RIGGIG purchased Lotus' 60% ownership of the total membership units (i.e., equity interests) of IQ Logic.

39.    The UPA provided that IQL-RIGGIG would pay Lotus an initial cash amount, a subsequent cash payment, and an additional amount in installment payments within two years of the closing date.

40.    As part of a settlement of later litigation between them, IQL-RIGGIG and Lotus subsequently negotiated a reduction in the purchase price of Lotus' 60% of the equity interests in IQ Logic.

41.    The re-negotiated purchase price for Lotus' 60% of the equity interests in IQ Logic consisted of the previously paid initial and subsequent cash payments and additional payments by IQL-RIGGIG to Mendicina and IQL-RIGGIG's law firm.

42.    IQ Logic's entire MDS business was stolen by Kingsbridge and Mendicina before IQL-RIGGIG's final cash payment to Lotus was due.

### The IQ Logic Operating Agreement

43.    On November 18, 2015, the Members of IQ Logic—IQL-RIGGIG and AMF6 Solutions—entered into an Amended and Restated Limited Liability Company Agreement governing the Company (the "IQ Logic Operating Agreement"). The IQ Logic Operating Agreement provided that the equity interests of IQL-RIGGIG and AMF6 Solutions in IQ Logic were 60% and 40%, respectively. *See* Exhibit A.

44.    The IQ Logic Operating Agreement provided that the Managers of IQ Logic were Edward Gibson ("Gibson"), Tarang (Tj) Gupta ("Gupta") and Mendicina.

45.    The IQ Logic Operating Agreement provided that the business and affairs of IQ Logic would be managed by or under the direction of the Board of Managers (the "Board").

46. Gibson, Gupta and Mendicina were elected to serve on the Board and did so serve together until Mendicina resigned from IQ Logic, at which time Gibson and Gupta remained Managers.

47. The IQ Logic Operating Agreement contained covenants by the Members respecting the use and dissemination of confidential and proprietary information and trade secrets of IQ Logic.

48. The IQ Logic Operating Agreement provided that except with the consent of the Board of Managers, no Member shall transfer all or any portion of his, her or its equity interest in IQ Logic, and that any unapproved transfer shall be void *ab initio*.

49. AMF6 Solutions, through Mendicina, eventually would breach the covenants in the IQ Logic Operating Agreement respecting the use and dissemination of confidential and proprietary information and trade secrets of IQ Logic.

### *The IQ Logic-Mendicina Employment Agreement*

50. On November 18, 2015, IQ Logic and Mendicina entered into an employment agreement (the "Mendicina Employment Agreement") pursuant to which Mendicina would continue to be employed by IQ Logic as Chief Executive Officer under IQL-RIGGIG's majority ownership. *See* Exhibit B.

51. The Mendicina Employment Agreement provided that Mendicina would have the following duties and responsibilities: development and dissemination of the corporate vision; overall accountability for achieving corporate financial objectives; sales and marketing strategy development; implementation of a sales and marketing strategy; salesforce development; and channel strategy and channel partner development.

11

52.     The Mendicina Employment Agreement provided that Mendicina, a minority owner of the business through AMF6 Solutions, "shall have a fiduciary duty to [IQ Logic], shall act with the utmost care and loyalty to [IQ Logic], and shall devote his full time and best efforts to the business and welfare of [IQ Logic]."  It also contained provisions restricting him from undermining IQ Logic's business and moving it to a competitor for a period of time after leaving IQ Logic.

53.     Consistent with the plan he had hatched with Kingsbridge, Mendicina breached his fiduciary and loyalty duties to IQ Logic, caused AMF6 Solutions to breach the IQ Logic Operating Agreement, violated each of the restrictive covenants in his employment agreement, and eventually would resign from IQ Logic.

### While IQL-RIGGIG Transforms and Grows IQ Logic, Mendicina and Kingsbridge Scheme to Steal It

54.     Following its 2015 acquisition of a majority interest in IQ Logic, IQL-RIGGIG increased IQ Logic's core competencies, diversified IQ Logic's service offerings, negotiated a number of new contracts, and greatly increased IQ Logic's total revenue—consistent with IQL-RIGGIG's track record of continuous improvement and creating value for investors.

55.     Specifically, under IQL-RIGGIG's leadership IQ Logic implemented a shift in strategy from offering predominantly hardware to selling and servicing significantly more profitable software.  IQL-RIGGIG additionally spearheaded the development of a marketable version of the SaaS content management software system that was in beta testing when IQL-RIGGIG acquired its majority stake in IQ Logic in 2015 and which eventually became IQ Connect.  Additionally, under IQL-RIGGIG's leadership, IQ Logic significantly increased its customer base and was on the path to growth IQ Logic had anticipated, for which it had planned, and which it would have realized but for Defendants' theft of IQ Logic.

12

56.     As IQ Logic was making steady gains under IQL-RIGGIG's leadership, Mendicina, unbeknownst to Plaintiffs, was engaged in discussions with Kingsbridge about Kingsbridge acquiring IQL-RIGGIG's majority interest in IQ Logic.  Specifically, on June 13, 2016, Mendicina sent an e-mail to Philip Jones ("Jones") of former majority owner Lotus advising that Mendicina would be "meeting with kingsbridge Friday in Chicago to talk about investing in IQlogic [sic] and taking out Rivera [sic] group."

57.     Mendicina's June 13, 2016 e-mail to Jones went on to suggest that "before I meet with kingsbridge we could get together and strategize payment structure that could work for both parties."  Mendicina concluded his e-mail by noting that "Kingsbridge is a privately own [sic] ... leasing company that we [sic] are concurrently financing our deals."

58.     On information and belief, Mendicina met with Kingsbridge in June 2016 as planned, and the two hatched their plan for Kingsbridge to "take out" IQL-RIGGIG.

59.     About a month later, Kingsbridge received an investment from TZP Capital Partners ("TZP"), a private equity fund that has raised $1.4 billion across its family of funds since its inception in 2007.  Kingsbridge announced the investment in a July 15, 2016 press release which provided in part that the investment "accelerates our ability to expand the breadth of products and services we offer to our customers."

60.     Over the next year, Mendicina and Kingsbridge continued to discuss and take incremental steps to move IQ Logic—lock, stock and barrel—to Kingsbridge.  The illicit plan involved Kingsbridge creating a new division to operate IQ Logic's business under the "Kingsbridge Technologies" name and advancing the Kingsbridge/TZP mission to "expand the breadth of [Kingsbridge's] products and services."

13

61.     One move on the IQ Logic-theft chess board (around the fourth quarter of 2016) involved Mendicina moving the leasing business of CoreLogic, IQ Logic's biggest customer, from Winthrop Resources ("Winthrop") to Kingsbridge. On information and belief, Mendicina discussed this move with Daniel Flagstad ("Flagstad"), the then co-Chief Executive Officer of Kingsbridge Holdings, who approved it.

62.     Mendicina concealed from IQ Logic and IQL-RIGGIG that moving the CoreLogic leasing business from Winthrop to Kingsbridge was an early step in eventually moving all of IQ Logic's clients and business to Kingsbridge.

63.     Prior to stealing IQ Logic, Kingsbridge had never been in the MDS business.

64.     At all times when Kingsbridge was engaged in discussions with Mendicina about stealing IQ Logic and re-purposing the business as "Kingsbridge Technologies," Kingsbridge knew that Mendicina was an employee of IQ Logic and knew or should have known that he did not have a controlling interest in IQ Logic and had no ability to sell IQ Logic—to Kingsbridge or anyone else.

65.     On August 9, 2017, without approval from IQ Logic, Mendicina sent his attorney, James E. ("Kimo") McCormick, III ("McCormick"), "hundreds of pages" of confidential IQ Logic documents in violation of his contractual and common law duties to IQ Logic. (Mendicina's e-mail to McCormick was among the documents Mendicina left on the IQ Logic server after he resigned from IQ Logic.)  McCormick, in an e-mail to Mendicina of the same date (which e-mail Mendicina also left on the IQ Logic server), advised that "Section 5.12 of the [Unit Purchase] Agreement for Got Docs, LLC is a confidentiality provision that is binding on the members of the LLC.  You should assume that this also covers you."

14

66.     In the same e-mail, McCormick advised Mendicina—apparently in response to Mendicina's question as to whether he and Kingsbridge could poach IQ Logic employees for Kingsbridge—"You should review carefully Schedule 5.6(h) to the Unit Purchase Agreement, as it lists six individuals who are parties to a Confidentiality and Proprietary Rights Agreement.  If these are any people who might want to join you, they will be restricted by their agreement. [Remember, you cannot/should not solicit anyone to come with you . . .]" (brackets in original).

67.     Two days later, August 11, 2017, Mendicina resigned as Chief Executive Officer of IQ Logic.  Mendicina delivered his resignation in a letter of the same date identifying "ongoing issues" with IQL-RIGGIG's stewardship of IQ Logic that "have led me to this decision."  Mendicina's resignation letter did not disclose that he had been in discussions with Kingsbridge for more than a year about how Kingsbridge could "take out" IQL-RIGGIG's majority stake in IQ Logic.  Nor did the letter disclose that Mendicina had sent a draft of his resignation letter to Flagstad, who either himself made (or directed that someone at his direction make) a number of substantive edits to the letter and returned it to Mendicina, who then sent the Kingsbridge-approved version to IQ Logic.

68.     Around this same time, August 2017, IQL-RIGGIG received a telephone call from one of IQ Logic's contacts at Xerox® that Mendicina was reaching out "to all IQ Logic customers" to move them to Kingsbridge.  IQL-RIGGIG additionally learned that Xerox® was struggling internally with the disruptive issue of the transfer of IQ Logic servicing accounts from the manager in Xerox®'s western region, who had been handling them, to a different manager in Xerox®'s central region closer to Illinois-based Kingsbridge.

69.     Thus, not only was Mendicina poaching IQ Logic customers for Kingsbridge (while still a 40% owner of IQ Logic through AMF6 Solutions), he was inducing Xerox®

15

managers to steal servicing accounts from each other, all in the service of enriching Kingsbridge and himself at IQ Logic's expense.

70.     Mendicina, with Kingsbridge's assistance, focused his resignation letter on perceived complaints about IQL-RIGGIG's governance of IQ Logic in order to not reveal that he had been in discussions with Kingsbridge for more than a year about how Kingsbridge could "take out" IQL-RIGGIG's majority stake in IQ Logic.

71.     On the same date Mendicina resigned from IQ Logic, Flagstad sent an e-mail to Mendicina stating "Hi Frank, I'd like to join your LinkedIn network."

72.     On information and belief, Flagstad's August 11, 2017 invitation to Mendicina to connect on LinkedIn was intended to create a document falsely evidencing that Flagstad had not "connected" with Mendicina before Mendicina's resignation from IQ Logic, when in fact the two had known each other for years and had been in discussions for more than a year about how Mendicina could move himself and IQ Logic's business to Kingsbridge.

73.     As CEO of IQ Logic, Mendicina had access to and regularly used confidential information concerning IQ Logic's business partners, customers, customer prospects, suppliers, supplier prospects, financial books and records, tax returns, sales pipeline information, receivables, trade secrets and intellectual property.

### Kingsbridge Hires Mendicina and Completes its Theft of IQ Logic

74.     Mendicina was hired by Kingsbridge within a matter of days after resigning from IQ Logic, as was planned long before his resignation.

75.     When Kingsbridge hired Mendicina, Kingsbridge knew or had reason to know that Mendicina's hire would violate the restrictive covenants in the Mendicina Employment Agreement.

16

76.     When Kingsbridge hired Mendicina, it knew or had reason to know that the UPA identified other IQ Logic employees who had employment agreements containing these same or similar restrictive covenants.

77.     When Kingsbridge hired Mendicina, it knew or had reason to know that the UPA prohibited AMF6 Solutions, through Mendicina, from soliciting any IQ Logic employees to move with him to Kingsbridge for an extended period after his departure from IQ Logic.

78.     When Kingsbridge hired Mendicina, it knew or had reason to know that the trade secrets and technology that would accompany Mendicina and other IQ Logic employees to Kingsbridge had been misappropriated from IQ Logic.

79.     Kingsbridge's primary purpose in hiring Mendicina was to steal IQ Logic's trade secrets, executives, employees, accounts, customers, contracts, business partners, sales pipeline, books and records, receivables, intellectual property, and goodwill.

80.     With Mendicina on board, Kingsbridge formed a new division, "Kingsbridge Technologies," which Mendicina would lead.

81.     Fulfilling the long-discussed plan, Kingsbridge Technologies would operate as the de facto successor-in-interest of IQ Logic notwithstanding that Kingsbridge did not own a single unit of IQ Logic equity, let alone a majority stake in IQ Logic.

82.     Nor could Kingsbridge have acquired a controlling interest in IQ Logic by acquiring Mendicina's equity in IQ Logic.  Mendicina's limited liability company, AMF6 Solutions, had only a minority (40%) equity stake in IQ Logic, which AM6F Solutions forfeited when it breached the IQ Logic Operating Agreement, and when Mendicina breached his fiduciary obligations to, and employment agreement with, IQ Logic.

83.     Before his resignation date, Mendicina, with the encouragement and assistance of Kingsbridge, and against the advice of his attorney, systematically solicited IQ Logic employees, customers, suppliers, business partners, and existing and prospective contracts, with the intention of moving them to Kingsbridge.

84.     After joining Kingsbridge, Mendicina, as an agent, servant or employee of Kingsbridge, systematically continued soliciting IQ Logic employees, customers, suppliers, business partners, and existing and prospective contracts, with the intention of moving them to Kingsbridge.

85.     After joining Kingsbridge, Mendicina, as an agent, servant or employee of Kingsbridge, intentionally accessed the records of IQ Logic, including business e-mail accounts with an "IQ-Logic.com" domain address, and intentionally and with bad intent provided to Kingsbridge's trial counsel a cache of e-mails from the "IQ-Logic.com" e-mail accounts, including numerous e-mails containing privileged communications between IQ Logic and its attorneys.

86.     After resigning as the Chief Executive Officer of IQ Logic and from IQ Logic's Board, ceasing to perform services for IQ Logic and beginning to work for Kingsbridge, Mendicina had no authority to access the records of IQ Logic including business e-mail accounts with an "IQ-Logic.com" domain address.

87.     Mendicina joined Kingsbridge on August 14, 2017, as Vice President, Print Services Division.

88.     Mendicina was assisted in stealing IQ Logic for Kingsbridge by certain IQ Logic employees who for a short time remained at IQ Logic after his departure.  These employees, including but not limited to Hiangkie Tjwan Han ("Han"), IQ Logic's Vice President, Business

Solutions, while still employed at IQ Logic, met at Mendicina's direction with IQ Logic customers, prospective customers and suppliers with the intention of moving them to Kingsbridge.

89.     Han in particular, while still employed at IQ Logic, expensed to Kingsbridge one or more solicitation meetings she had with IQ Logic customers, including its biggest customer, CoreLogic, evidencing that the meetings were for Kingsbridge's benefit even as they were conducted on IQ Logic time.

90.     Han resigned from IQ Logic on August 17, 2017 and joined Kingsbridge on or about August 23, 2017.

91.     Han is currently employed by the Kingsbridge as Vice President, Business Solutions—the identical title she held at IQ Logic.

92.     Shortly after Mendicina joined Kingsbridge, Mendicina and Kingsbridge hacked into IQ Logic's website, copied it and placed it on a Kingsbridge URL. Mendicina and Kingsbridge arranged that anyone visiting IQ Logic's website automatically would be re-directed to the Kingsbridge website.

93.     For a period of time before Mendicina and Kingsbridge hacked into IQ Logic's website and effected an automatic re-direct from the IQ Logic website to the Kingsbridge website, Kingsbridge and IQ Logic had websites of virtually identical content other than the URL identifier in the web browser. None of the content on the Kingsbridge website at that time was created by Kingsbridge—all of it had been stolen from IQ Logic.

94.     Kingsbridge paid Plaintiffs nothing for the IQ Logic website or website content.

95.     Kingsbridge never requested or obtained a license from IQ Logic to the IQ Logic website or website content.

96.     Kingsbridge never requested or obtained IQ Logic's permission to use or copy the IQ Logic website or website content.

97.     The IQ Logic website and website content misappropriated by Kingsbridge was written and developed for IQ Logic by Peter Loebbecke ("Loebbecke"), an IQ Logic contractor who later associated with Kingsbridge as a by-product of Kingsbridge's campaign to poach IQ Logic personnel.

98.     Loebbecke is currently employed by or under contract with Kingsbridge.

99.     Kingsbridge solicited additional key employees and contractors of IQ Logic to join Kingsbridge, fulfilling the plan dating back to Mendicina's discussion with Kingsbridge in 2016 about "taking out" IQL-RIGGIG's majority interest in IQ Logic.  In addition to Mendicina, Han and Loebbecke, Kingsbridge poached former IQ Logic employees Bill Easton, Brian Slayback and Paul Skorgeson, and former IQ Logic contractor Ted Lavoie.

100.    Kingsbridge and Mendicina also hacked into IQ Logic's 8x8™ VoIP for business telephone number and redirected it to Kingsbridge so that existing and potential customers and suppliers attempting to contact IQ Logic would be connected instead to Kingsbridge.

101.    On information and belief, customers, potential customers and suppliers connected to Kingsbridge who thought they were calling IQ Logic via the stolen 8x8™ VoIP telephone number were falsely told by Kingsbridge that IQ Logic had been acquired by Kingsbridge, that IQ Logic no longer existed, and that going forward, IQ Logic's products and services would have to be provided by Kingsbridge Technologies.

102.    On information and belief, Kingsbridge misrepresented to numerous IQ Logic customers, prospective customers and suppliers that IQ Logic had been acquired by Kingsbridge,

that IQ Logic no longer existed, and that going forward, IQ Logic's products and services would have to be provided by Kingsbridge Technologies.

103.    Kingsbridge and Mendicina also stole IQ Logic's sales pipeline information which IQ Logic maintained on PipelineDeals, a customer relations management ("CRM") platform. On information and belief, Kingsbridge and Mendicina used the information they stole from PipelineDeals to identify and approach IQ Logic's existing and prospective sales targets.

104.    Kingsbridge and Mendicina eventually also:

    a.   stole IQ Logic's business analytics, marketing and sales capabilities;

    b.   signed Kingsbridge up with Xerox® in the Central Region as a Xerox® reseller and Managed Print Services Provider;

    c.   converted numerous IQ Logic prospective customers, including Universal Electronics;

    d.   approached IQ Logic existing customers, prospective customers and suppliers in order to steal service business;

    e.   acquired profitable IQ Logic monthly service contracts;

    f.   stole IQ Logic's goodwill, contracts, trade secrets and intellectual property (including but not limited to IQ Connect, IQ Assessment and IQ Profit Management); and

    g.   aggressively acted to force IQ Logic out of business.

105.    Kingsbridge paid Plaintiffs nothing for IQ Logic's business analytics, marketing and sales capabilities, goodwill, contracts, trade secrets and intellectual property (including but not limited to IQ Connect, IQ Assessment and IQ Profit Management).

106.    Kingsbridge never requested or obtained a license from IQ Logic to any IQ Logic intellectual property (including but not limited to IQ Connect, IQ Assessment and IQ Profit Management).

107.    With IQ Logic effectively out of the way, Kingsbridge proceeded to mislead and confuse the public, including but not limited to existing and former IQ Logic customers, potential customers and suppliers.

108.    In particular, Kingsbridge proceeded to populate its website with information describing "Kingsbridge's data analytics services," and "Kingsbridge's print management services," as well as touting its capabilities in "device analytics," "document analytics," "user analytics," and "process analytics," falsely leading consumers and the public to believe that Kingsbridge owned and had developed the know-how behind such services, when in fact Kingsbridge had stolen it all from IQ Logic.

109.    Kingsbridge and Mendicina spoke highly of the intellectual property they stole from IQ Logic.  In a draft email to Alex Trachtman of Confie.com which Mendicina sent to Han on March 14, 2018, Mendicina wrote: "I can assure you that no one has the software analytics that Kingsbridge provide [sic] for Xerox, not even Xerox.  Xerox send [sic] a team of people this week just to view our software.  They were blown away.  I will send the emails.  Darrin and Jim are the right guys.  We don't need them for our sales our software will sell itself."  Of course, the "software analytics" Mendicina was touting were developed by IQ Logic and stolen by Kingsbridge and Mendicina.

110.    Kingsbridge and Mendicina perpetuated the confusion or misunderstanding as to who was in fact offering and had developed the various services they stole from IQ Logic when they copied IQ Logic's website wholesale, published it on a Kingsbridge URL, arranged to have

anyone visiting the IQ Logic website automatically re-directed to the Kingsbridge website, and moved IQ Logic's 8x8™ VoIP telephone number to Kingsbridge.

### Kingsbridge Attempts a Post-Theft Distressed Buy-Out of IQL-RIGGIG's Controlling Interest in IQ Logic

111.    The illicit plan to steal IQ Logic worked, after which Kingsbridge attempted to legally acquire IQL-RIGGIG's majority interest in IQ Logic for a pittance and escape liability for the theft.

112.    On or about November 13, 2017, Mendicina met with one of IQL-RIGGIG's executives in person to discuss Kingsbridge's purchase of IQL-RIGGIG's controlling stake in IQ Logic.

113.    At the November 13, 2017 meeting, Mendicina said Kingsbridge wanted to "make [IQL-RIGGIG's executive] whole," which IQL-RIGGIG understood to mean Kingsbridge paying IQL-RIGGIG the amount the executive personally had invested in IQ Logic. Mendicina and IQL-RIGGIG's executive agreed that the executive should have a follow-up meeting with Flagstad, Kingsbridge's co-CEO.

114.    On November 21, 2017, IQL-RIGGIG's executive and Flagstad met at the Montage Hotel in Laguna Beach, California (the "Montage Meeting").

115.    During the Montage Meeting, Flagstad told IQL-RIGGIG's executive that Kingsbridge would purchase IQL-RIGGIG's majority interest in IQ Logic for a small six-figure sum to be paid over time.

116.    IQL-RIGGIG did not accept the low-ball offer.

117.    Negotiations continued thereafter, with Kingsbridge's General Counsel, Jordan, taking over the negotiating role for Kingsbridge.

118.     Jordan did not increase Kingsbridge's offer, instead adding an additional condition:  Kingsbridge would pay the small sum to IQL-RIGGIG's executive personally rather than to IQL-RIGGIG, so that IQL-RIGGIG's other investors in IQ Logic vindictively would be cut out.  IQL-RIGGIG refused.

119.     Jordan's response to IQL-RIGGIG's rejection of the offer was "we'll just take it [IQ Logic]" then.  Which Kingsbridge did.

### FIRST CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT

### (IQ LOGIC v. KINGSBRIDGE)

120.     Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

121.     IQ Logic had valid and enforceable agreements with customers to purchase IQ Logic's MDS products and services.

122.     At all times relevant, Kingsbridge was aware of these agreements and contractual relationships.

123.     Beginning in 2017, Kingsbridge began contacting IQ Logic customers, falsely stating that IQ Logic was out of business, that the products and services IQ Logic was providing to such customers had been acquired by Kingsbridge, and that going forward IQ Logic's products and services would have to be provided by Kingsbridge Technologies.

124.     Around this same time, Kingsbridge also misappropriated IQ Logic's website and telephone number, which IQ Logic's customers had been using to contact and interact with IQ Logic pursuant to their contractual relationships with IQ Logic.

125.     In making the false and misleading representations and misappropriating IQ Logic's website and telephone number, Kingsbridge intentionally and unjustifiably interfered

with IQ Logic's contractual relationships with customers and suppliers, and induced breaches of contract by those customers and suppliers. Kingsbridge has no reasonable basis in law or fact for its false statements and misappropriation of IQ Logic's property.

126.    Kingsbridge interfered with IQ Logic's contractual relationships in an attempt to gain a competitive advantage and with the malicious intent to cause harm to IQ Logic.

127.    As a direct and proximate result of Kingsbridge's willful and intentional interference with these contractual relationships, customers and suppliers have breached their contracts with IQ Logic to purchase IQ Logic's MDS products and services.

128.    Kingsbridge acted willfully and maliciously in interfering with IQ Logic's contractual relationships as set forth herein.

129.    Kingsbridge's willful and intentional interference with IQ Logic's contractual relationships proximately caused, and continues to cause, immediate and irreparable harm to IQ Logic's goodwill and commercial reputation, for which there is no adequate remedy at law, in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

### SECOND CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (IQ LOGIC v. KINGSBRIDGE)

130.    Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

131.    Because of its high-quality service and products, IQ Logic developed business relationships with numerous customers and suppliers, through which it derived or had the potential to derive substantial economic benefit. IQ Logic had a reasonable expectation of

entering into valid business relationships with these customers and suppliers for the purchase of its MDS products and services.

132. Kingsbridge knew of these beneficial business relationships and business expectancies.

133. Without privilege or justification, Kingsbridge intentionally and tortiously interfered with these business relationships and business expectancies, as well as with IQ Logic's economic advantage, through its wrongful conduct described herein.

134. Such interference resulted in irreparable injury to IQ Logic's goodwill and reputation in addition to proximately causing harm in the form of lost profits for which IQ Logic is entitled to compensation and injunctive relief.

135. Kingsbridge acted willfully and maliciously in interfering with IQ Logic's business relationships and business expectancies as set forth herein.

136. Kingsbridge's willful and malicious interference with IQ Logic's business relationships and business expectancies proximately caused, and continues to cause, immediate and irreparable harm to IQ Logic's goodwill and commercial reputation for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

**THIRD CAUSE OF ACTION**
**BREACH OF THE MENDICINA EMPLOYMENT AGREEMENT**

**(IQ LOGIC v. MENDICINA)**

137. Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

138. For a period of time following Mendicina's resignation from IQ Logic, Mendicina had continuing fiduciary and loyalty duties to IQ Logic and was bound by the Mendicina Employment Agreement. The Mendicina Employment Agreement:

a. provided, *inter alia*, that while employed by IQ Logic, Mendicina would have a fiduciary duty to IQ Logic, would act with utmost care and loyalty to IQ Logic, and would devote his full time and best efforts to the business and welfare of IQ Logic;

b. contained a "Noncompetition" clause pursuant to which Mendicina agreed that for a period commencing on the date of the agreement and expiring on the fifth anniversary of the termination of his employment with IQ Logic, Mendicina would not associate, directly or indirectly, with any business in competition with IQ Logic, or own, directly or indirectly, any debt or equity interests of a competing business;

c. contained a "Nondisclosure" clause pursuant to which Mendicina agreed at all times to hold as secret and confidential any and all knowledge, information, developments, trade secrets, know-how and confidences of IQ Logic or IQ Logic's business, of which he had knowledge as of the date of the agreement's execution, or of which he may acquire knowledge while employed by IQ Logic; and

d. contained a "Non-Solicitation" clause, pursuant to which Mendicina agreed that for a period commencing on the date of the agreement and expiring on the fifth anniversary of the termination of his employment with IQ Logic, Mendicina would not knowingly, in any geographic area in which IQ Logic

27

conducts business, induce, or facilitate or assist a third party to induce, any person, business, or entity which was a material supplier or customer of IQ Logic during Mendicina's employment with IQ Logic (or was during the twelve months prior to the date of the agreement) to terminate any written or oral agreement with, or reduce its business with, IQ Logic, or employ or solicit to employ in a business other than that of IQ Logic, or facilitate with a third party to so employ or solicit to employ, any employees of IQ Logic.

139. The "Noncompetition", "Nondisclosure" and "Non-Solicitation" covenants in the Mendicina Employment Agreement were ancillary to a valid contract or relationship between Mendicina and IQ Logic and supported by adequate consideration.

140. The "Noncompetition", "Nondisclosure" and "Non-Solicitation" covenants in the Mendicina Employment Agreement imposed reasonable restrictions on Mendicina to protect IQ Logic's legitimate interests, were no greater than were required for the protection of IQ Logic, did not impose undue hardship on Mendicina, and were not injurious to the public.

141. When Mendicina, accepted employment from Kingsbridge, he knew or had reason to know that he had continuing fiduciary and loyalty duties to IQ Logic and that he was bound by the "Noncompetition", "Nondisclosure" and "Non-Solicitation" restrictive covenants in the Mendicina Employment Agreement.

142. While still employed at IQ Logic and after joining Kingsbridge, Mendicina breached the Mendicina Employment Agreement, including the post-employment restrictive covenants contained therein, by competing with IQ Logic, disclosing to Kingsbridge IQ Logic's trade secrets and other confidential and proprietary information, and soliciting IQ Logic employees, customers, accounts, and prospects.

28

143.     Plaintiff has performed under and complied with the Mendicina Employment Agreement.

144.     Mendicina's breach of the Mendicina Employment Agreement and the post-employment restrictive covenants contained therein proximately caused, and continues to cause, immediate and irreparable harm to Plaintiff IQ Logic for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

## FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH
## THE MENDICINA EMPLOYMENT AGREEMENT

### (IQ LOGIC v. KINGSBRIDGE)

145.     Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

146.     For a period of time following Mendicina's resignation from IQ Logic, Mendicina had continuing fiduciary and loyalty duties to IQ Logic and was bound the Mendicina Employment Agreement.  The Mendicina Employment Agreement:

a.   provided, *inter alia*, that while employed by IQ Logic, Mendicina would have a fiduciary duty to IQ Logic, would act with utmost care and loyalty to IQ Logic, and would devote his full time and best efforts to the business and welfare of IQ Logic;

b.    contained a "Noncompetition" clause pursuant to which Mendicina agreed that for a period commencing on the date of the agreement and expiring on the fifth anniversary of the termination of his employment with IQ Logic, Mendicina would not associate, directly or indirectly, with any business in

competition with IQ Logic, or own, directly or indirectly, any debt or equity interests of a competing business;

c.   contained a "Nondisclosure" clause pursuant to which Mendicina agreed at all times to hold as secret and confidential any and all knowledge, information, developments, trade secrets, know-how and confidences of IQ Logic or IQ Logic's business, of which he had knowledge as of the date of the agreement's execution, or of which he may acquire knowledge while employed by IQ Logic; and

d.   contained a "Non-Solicitation" clause, pursuant to which Mendicina agreed that for a period commencing on the date of the agreement and expiring on the fifth anniversary of the termination of his employment with IQ Logic, Mendicina would not knowingly, in any geographic area in which IQ Logic conducts business, induce, or facilitate or assist a third party to induce, any person, business, or entity which was a material supplier or customer of IQ Logic during Mendicina's employment with IQ Logic (or was during the twelve months prior to the date of the agreement) to terminate any written or oral agreement with, or reduce its business with, IQ Logic, or employ or solicit to employ in a business other than that of IQ Logic, or facilitate with a third party to so employ or solicit to employ, any employees of IQ Logic.

147.   The "Noncompetition", "Nondisclosure" and "Non-Solicitation" covenants in the Mendicina Employment Agreement were ancillary to a valid contract or relationship between Mendicina and IQ Logic and supported by adequate consideration.

148.   The "Noncompetition", "Nondisclosure" and "Non-Solicitation" covenants in the Mendicina Employment Agreement imposed reasonable restrictions on Mendicina to protect IQ Logic's legitimate interests, were no greater than were required for the protection of IQ Logic, did not impose undue hardship on Mendicina, and were not injurious to the public.

149.   When Kingsbridge hired Mendicina, Kingsbridge knew or had reason to know that Mendicina had continuing fiduciary and loyalty duties to IQ Logic and that Mendicina was bound by the "Noncompetition", "Nondisclosure" and "Non-Solicitation" restrictive covenants in the Mendicina Employment Agreement.

150.   After hiring Mendicina, Kingsbridge tortiously interfered with the Mendicina Employment Agreement, including the post-employment restrictive covenants contained therein, by requiring and/or encouraging him to compete with IQ Logic, disclose to Kingsbridge IQ Logic's trade secrets and other confidential and proprietary information, and solicit IQ Logic employees, customers, accounts, and prospects.

151.   By requiring and/or encouraging Mendicina to compete with IQ Logic, disclose to Kingsbridge IQ Logic's trade secrets and other confidential and proprietary information, and solicit IQ Logic employees, customers, accounts, and prospects, Kingsbridge intentionally and unjustifiably induced Mendicina to breach the Mendicina Employment Agreement and the post-employment restrictive covenants contained therein.

152.   Kingsbridge's tortious interference with the Mendicina Employment Agreement and the post-employment restrictive covenants contained therein proximately caused, and continues to cause, immediate and irreparable harm to Plaintiff IQ Logic for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

31

**FIFTH CAUSE OF ACTION**
**BREACH OF THE IQ LOGIC OPERATING AGREEMENT**

**(IQ LOGIC v. MENDICINA AND AMF6 SOLUTIONS)**

153.    Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

154.    The IQ Logic Operating Agreement Contained a "Confidentiality" clause pursuant to which each Member of IQ Logic, including AMF6 Solutions, on behalf of its directors, officers, stockholders, partners, employees, agents and members (i.e., Mendicina) recognized and acknowledged that he, she or it may receive certain confidential and proprietary information and trade secrets of IQ Logic including identifiable, specific and discrete business opportunities being pursued by IQ Logic.

155.    Under the "Confidentiality" clause in the IQ Logic Operating Agreement, Mendicina, through AMF6 Solutions, agreed that he would not, during or after the term of the Agreement, take commercial or proprietary advantage of or profit from any confidential information or provide or disclose confidential information to any person for any reason except:

       a.  to authorized representatives and employees of IQ Logic and as otherwise may be proper in the course of performing its obligations or enforcing its rights under the Agreement;

       b.  to any bona fide prospective purchaser of its equity or assets, provided that such prospective purchaser or prospective merger partner agreed to be bound by the provisions of the "Confidentiality" clause; and

       c.   as is required to be disclosed by order of a court of competent jurisdiction or other compulsory legal process.

156.    Under the "Confidentiality" clause, Mendicina, through AMF6 Solutions, acknowledged that a breach of any of the restrictive covenants contained therein may result in material irreparable injury to IQ Logic for which there is no adequate remedy at law.

157.    When Mendicina left IQ Logic for Kingsbridge, he knew or had reason to know, through AMF6 Solutions, that he was bound by the IQ Logic Operating Agreement and the restrictive covenants contained therein.

158.    Plaintiff has performed under and complied with the IQ Logic Operating Agreement.

159.    By competing with IQ Logic, disclosing to Kingsbridge IQ Logic's trade secrets and other confidential and proprietary information, and soliciting IQ Logic employees, customers, accounts, and prospects, Mendicina, through AMF6 Solutions, breached the IQ Logic Operating Agreement.

160.    Mendicina's breach of the IQ Logic Operating Agreement, through AMF6 Solutions, proximately caused, and continues to cause, immediate and irreparable harm to Plaintiff IQ Logic for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

### SIXTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH
### <u>THE IQ LOGIC OPERATING AGREEMENT</u>

### (IQ LOGIC v. KINGSBRIDGE)

161.    Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

162.    The IQ Logic Operating Agreement Contained a "Confidentiality" clause pursuant to which each Member of IQ Logic, including AMF6 Solutions, on behalf of its directors, officers, stockholders, partners, employees, agents and members (i.e., Mendicina) recognized and acknowledged that he, she or it may receive certain confidential and proprietary information and trade secrets of IQ Logic including identifiable, specific and discrete business opportunities being pursued by IQ Logic.

163.    Under the "Confidentiality" clause in the IQ Logic Operating Agreement, Mendicina, through AMF6 Solutions, agreed that he would not, during or after the term of the Agreement, take commercial or proprietary advantage of or profit from any confidential information or provide or disclose confidential information to any person for any reason except:

   a.  to authorized representatives and employees of IQ Logic and as otherwise may be proper in the course of performing its obligations or enforcing its rights under the Agreement;

   b.  to any bona fide prospective purchaser of its equity or assets, provided that such prospective purchaser or prospective merger partner agreed to be bound by the provisions of the "Confidentiality" clause; and

   c.   as is required to be disclosed by order of a court of competent jurisdiction or other compulsory legal process.

164.    Under the "Confidentiality" clause, AMF6 Solutions, through Mendicina, acknowledged that a breach of any of the restrictive covenants contained therein may result in material irreparable injury to IQ Logic for which there is no adequate remedy at law.

165.     When Kingsbridge hired Mendicina, Kingsbridge knew or had reason to know that Mendicina, through AMF6 Solutions, was bound by the IQ Logic Operating Agreement and the restrictive covenants contained therein.

166.     After hiring Mendicina, Kingsbridge tortiously interfered with the IQ Logic Operating Agreement by requiring and/or encouraging Mendicina to compete with IQ Logic, disclose to Kingsbridge IQ Logic's trade secrets and other confidential and proprietary information, and solicit IQ Logic employees, customers, accounts, and prospects.

167.     By requiring and/or encouraging Mendicina to compete with IQ Logic, disclose to Kingsbridge IQ Logic's trade secrets and other confidential and proprietary information, and solicit IQ Logic employees, customers, accounts, and prospects, Kingsbridge intentionally and unjustifiably induced AMF6 Solutions, through Mendicina, to breach the IQ Logic Operating Agreement.

168.     Kingsbridge's tortious interference with the IQ Logic Operating Agreement proximately caused, and continues to cause, immediate and irreparable harm to Plaintiff IQ Logic for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

<div align="center">

**SEVENTH CAUSE OF ACTION**
**UNFAIR COMPETITION UNDER THE LANHAM ACT**

**(IQ LOGIC v. KINGSBRIDGE)**

</div>

169.     Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

170.     This is a claim for unfair competition under the Lanham Act, 15. U.S.C. §1125.

171.    On information and belief, Kingsbridge made false and misleading representations to IQ Logic's customers, potential customers, and suppliers to promote its products and services and to disparage IQ Logic's products and services, including but not limited to representations that:

      a.   IQ Logic was out of business;

      b.   the products and services IQ Logic was providing to such customers had been legally acquired by Kingsbridge; and

      c.   going forward the products and services offered by IQ Logic would have to be provided by Kingsbridge Technologies.

172.    Kingsbridge additionally falsely represented to IQ Logic's customers, potential customers, and suppliers that:

      a.   Kingsbridge was the owner of various print management, data management and business process management trade secrets, intellectual property and know-how, when in fact Kingsbridge had stolen the same from IQ Logic; and

      b.   Kingsbridge owned and had developed various know-how and capabilities including "Kingsbridge's data analytics services," "Kingsbridge's print management services," and capabilities in "device analytics," "document analytics," "user analytics," and "process analytics," when in fact Kingsbridge had stolen such know-how and capabilities from IQ Logic.

173.    Kingsbridge's false and misleading statements actually deceived or were likely to deceive a substantial segment of the intended audience, i.e., IQ Logic's customers, potential customers, and suppliers for IQ Logic's products and services.

36

174.     Kingsbridge caused the false and misleading statements to enter interstate commerce.

175.     Kingsbridge's false and misleading statements resulted in actual or probable injury to IQ Logic by causing actual, and/or potential customers not to purchase IQ Logic's products and services.

176.     Kingsbridge's false and misleading statements were undertaken in bad faith in that they were made with knowledge of their falsity.

177.     Kingsbridge's false and misleading statements proximately caused, and continue to cause, immediate and irreparable harm to IQ Logic's goodwill and commercial reputation for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF THE ILLINOIS UNIFORM
### DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/2)

### (IQ LOGIC v. KINGSBRIDGE)

178.     Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

179.     On information and belief, Kingsbridge made false and misleading representations to IQ Logic's customers, potential customers, and suppliers to promote its products and services and to disparage IQ Logic's products and services, including but not limited to representations that:

    a.   IQ Logic was out of business;

37

      b.   the products and services IQ Logic was providing to such customers had been legally acquired by Kingsbridge; and

      c.   going forward the products and services offered by IQ Logic would have to be provided by Kingsbridge Technologies.

180.   Kingsbridge additionally falsely represented to IQ Logic's customers, potential customers, and suppliers that:

      a.   Kingsbridge was the owner of various print management, data management and business process management trade secrets, intellectual property and know-how, when in fact Kingsbridge had stolen the same from IQ Logic; and

      b.   Kingsbridge owned and had developed various know-how and capabilities including "Kingsbridge's data analytics services," "Kingsbridge's print management services," and capabilities in "device analytics," "document analytics," "user analytics," and "process analytics," when, in fact, Kingsbridge had stolen such know-how and capabilities from IQ Logic.

181.   Kingsbridge's false and misleading statements as described above represent deceptive trade practices in that, in the course of its business, Kingsbridge caused likelihood of confusion or misunderstanding as to the source of its goods or services; disparaged the goods, services or business of IQ Logic by false or misleading representations of fact; and otherwise engaged in conduct which similarly created a likelihood of confusion or misunderstanding, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

182.   Kingsbridge willfully engaged in the deceptive trade practices described above.

183.   Kingsbridge's deceptive trade practices proximately caused, and continue to cause, immediate and irreparable harm to IQ Logic's goodwill and commercial reputation for

which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to injunctive relief.

**NINTH CAUSE OF ACTION**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/2)**

**(IQ LOGIC v. KINGSBRIDGE)**

184.    Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

185.    On information and belief, Kingsbridge made false and misleading representations to IQ Logic's customers, potential customers, and suppliers to promote its products and services and to disparage IQ Logic's products and services, including, but not limited to, representations that:

    a.    IQ Logic was out of business;

    b.    the products and services IQ Logic was providing to such customers had been legally acquired by Kingsbridge; and

    c.    going forward the products and services offered by IQ Logic would have to be provided by Kingsbridge Technologies.

186.    Kingsbridge additionally falsely represented to IQ Logic's customers, potential customers, and suppliers that:

    a.    Kingsbridge was the owner of various print management, data management, and business process management trade secrets, intellectual property and know-how, when in fact Kingsbridge had stolen the same from IQ Logic; and

    b.    Kingsbridge owned and had developed various know-how and capabilities including "Kingsbridge's data analytics services," "Kingsbridge's print

39

management services," and capabilities in "device analytics," "document analytics," "user analytics," and "process analytics," when in fact Kingsbridge had stolen such know-how and capabilities from IQ Logic.

187.    Kingsbridge's false and misleading statements as described above constitute unfair methods of competition and unfair and deceptive acts and practices.

188.    Kingsbridge's false and misleading statements and other methods of deception occurred in the course of trade or commerce.

189.    Kingsbridge made such false and misleading statements with the intent that others rely thereon, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.

190.    Kingsbridge's false and misleading statements proximately caused, and continue to cause, immediate and irreparable harm to IQ Logic's goodwill and commercial reputation for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

**TENTH CAUSE OF ACTION**
**TRADE SECRET MISAPPROPRIATION UNDER**
**THE DEFEND TRADE SECRETS ACT ("DTSA") (18 U.S.C. § 1836 *et seq.*)**

**(IQ LOGIC v. KINGSBRIDGE AND MENDICINA)**

191.    Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

192.    IQ Logic is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce.  Such trade secrets comprise IQ Logic's financial, business, scientific, technical, economic, and engineering information,

including but not limited to software, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and both tangible and intangible codes which are stored, compiled and memorialized physically, electronically and graphically.

193.    The information described in the preceding paragraph, along with other confidential information, constitute trade secrets under the meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* ("DTSA").

194.    IQ Logic has taken reasonable measures to keep such information secret.

195.    IQ Logic's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

196.    IQ Logic's trade secrets are used in interstate commerce as part of IQ Logic's business model, with a nationwide scope.

197.    Kingsbridge and Mendicina disclosed and used IQ Logic's trade secrets without IQ Logic's express or implied consent.  Kingsbridge used improper means to acquire knowledge of the trade secrets.

198.    Kingsbridge and Mendicina knew or had reason to know at the time of disclosure or use that their knowledge of the trade secrets was derived from or through IQ Logic, and Kingsbridge used improper means to acquire the trade secrets.  Kingsbridge acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.  Kingsbridge and Mendicina owed a duty to IQ Logic to maintain the secrecy of its trade secrets or limit the use thereof.

41

199.     Kingsbridge's and Mendicina's improper means in disclosing IQ Logic's trade secrets include Defendants' misrepresentation, breach, or inducement of a breach of duty to maintain secrecy of the trade secrets.

200.     Kingsbridge and Mendicina, with intent to convert trade secrets that are related to a product or service used in or intended for use in interstate or foreign commerce to the economic benefit of IQ Logic, and intending or knowing that the offense will injure IQ Logic, knowingly did the following:

      a.  stole, or without authorization, removed, concealed, or by fraud, artifice or deception obtained such information;

      b.  without authorization copied, duplicated, sketched, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information;

      c.  received or processed such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

      d.  attempted to commit any offense described in paragraphs (a) through (c); or

      e.  conspired with one or more other persons to commit any offense described in paragraphs (a) through (c), and one or more of such persons performed an act to effect the object of the conspiracy.

201.     Kingsbridge and Mendicina continue to misappropriate IQ Logic's proprietary information through continued use of the trade secrets.

202.     Pursuant to 18 U.S.C. § 1836(b)(3)(A), Plaintiff IQ Logic is entitled to injunctive relief to prevent future misappropriation and use of its trade secrets.

203.     Pursuant to 18 U.S.C. § 1836(b)(3)(B), Plaintiff IQ Logic is entitled to damages for actual losses and disgorgement for all unjust enrichment caused by the misappropriation of its trade secrets.

204.     Pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D), Plaintiff IQ Logic is entitled to recover its attorneys' fees and exemplary damages totaling twice the award made under § 1836(b)(3)(B) for Kingsbridge's and Mendicina's willful and malicious misappropriation.

## ELEVENTH CAUSE OF ACTION
## TRADE SECRET MISAPPROPRIATION –
## <u>ILLINOIS TRADE SECRETS ACT (765 ILCS 1065)</u>

### (IQ LOGIC v. KINGSBRIDGE AND MENDICINA)

205.     Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

206.     IQ Logic owns valuable trade secrets that were disclosed to Kingsbridge by Kingsbridge's employees, former IQ Logic employees and/or third-parties who knew or had reason to know that such trade secrets are confidential and proprietary to IQ Logic.  Despite such knowledge, Kingsbridge and Mendicina improperly used for themselves for business purposes and disclosed to third parties such trade secrets without IQ Logic's express or implied consent.

207.     As a result of Kingsbridge's and Mendicina's misappropriation of the trade secrets, Plaintiff IQ Logic has been damaged in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
## <u>DIRECT COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)</u>

### (IQ LOGIC v. KINGSBRIDGE)

208.     Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

209. Kingsbridge's copying and re-publication of the validly copyrighted IQ Logic website and website content interfered with IQ Logic's exclusive right to reproduce, distribute and display the copyrighted works.

210. Kingsbridge's conduct constitutes copyright infringement that this Court may remedy under Sections 106 and 501 of the Copyright Act, 17 U.S.C. § 101, et seq.

211. Instances of copyright infringement occur whenever one of Kingsbridge's users, without authorization of the copyright owner, IQ Logic, uses Kingsbridge's network to download a copyrighted content file and/or images. Such acts constitute unauthorized reproduction and distribution and result in unauthorized copies. Kingsbridge participates in, facilitates, materially contributes to and encourages these infringements.

212. Kingsbridge's aforesaid activities constitute infringement of IQ Logic's copyrights.

213. As a result of the injury suffered by IQ Logic's business from Kingsbridge's actions of direct copyright infringement, Plaintiff IQ Logic is entitled to recover actual and/or statutory damages, which shall be determined at trial, and costs of this action, including reasonable attorneys' fees, as well as injunctive relief to prevent future infringement.

## THIRTEENTH CAUSE OF ACTION
## <u>CONVERSION</u>

### (IQ LOGIC AND IQL-RIGGIG v. KINGSBRIDGE)

214. Plaintiffs IQ Logic and IQL-RIGGIG incorporate the foregoing allegations as if fully re-alleged and restated herein.

215. As described above, Kingsbridge wrongfully and without authorization acquired and assumed control, dominion, or ownership of IQ Logic's entire business including its trade secrets, executives, employees, accounts, books and records, sales pipeline, customers, contracts,

44

business partners, receivables, intellectual property, and goodwill. Kingsbridge's theft included IQ Logic's confidential and proprietary information, including, but not limited to, software, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically, without IQ Logic's express or implied consent.

216.    IQ Logic had an absolute and unconditional right to the immediate possession of its trade secrets, executives, employees, accounts, books and records, sales pipeline, customers, contracts, business partners, receivables, intellectual property, goodwill, and confidential and proprietary information.

217.    IQ Logic demanded possession of IQ Logic's trade secrets, executives, employees, accounts, books and records, sales pipeline, customers, contracts, business partners, receivables, intellectual property, goodwill, and confidential and proprietary information from Kingsbridge.   Kingsbridge refused to return any of IQ Logic's trade secrets, executives, employees, accounts, books and records, sales pipeline, customers, contracts, business partners, receivables, intellectual property, goodwill, and confidential and proprietary information and has retained possession thereof.

218.    Kingsbridge's actions have damaged Plaintiff IQ Logic in an amount to be determined at trial.

219.    In addition to Kingsbridge's wrongful and without authorization acquisition and assumption of control over IQ Logic's entire business, Kingsbridge wrongfully and without authorization deprived Plaintiff IQL-RIGGIG's of its equity interest in IQ Logic, and caused Plaintiff IQL-RIGGIG to suffer economic loss including but not limited to its lost monetary

investment in IQ Logic, the fair market value of its controlling equity interest in IQ Logic, and related consequential damages.

## FOURTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT

### (IQ LOGIC v. KINGSBRIDGE)

220.    Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

221.    Kingsbridge continues to improperly and unjustly retain IQ Logic's confidential and proprietary information, including, but not limited to, software, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically, without IQ Logic's express or implied consent.

222.    Kingsbridge has unjustly retained benefits to IQ Logic's detriment, and Kingsbridge's retention thereof violates fundamental principles of justice, equity, and good conscience.  Kingsbridge has been unjustly enriched by retaining profits gained from sales of Kingsbridge Technologies' MDS products and services, which use, and were developed using, IQ Logic's confidential and proprietary information.

223.    IQ Logic has been deprived of attribution and royalties for products and services it developed and which use IQ Logic's proprietary information.

224.    Kingsbridge should be required to disgorge all monies, profits and gains it has obtained or will unjustly obtain in the future at the expense of Plaintiff IQ Logic, and a constructive trust should be imposed thereof for the benefit of Plaintiff IQ Logic.

46

## FIFTHTEENTH CAUSE OF ACTION
## <u>BREACH OF FIDUCIARY DUTIES</u>

### (IQ LOGIC v. MENDICINA)

225.    Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

226.    Mendicina was the Chief Executive Officer of IQ Logic and, as such, had a fiduciary relationship with IQ Logic.  In his role as Chief Executive Officer, Mendicina played a central role in developing, implementing, and improving IQ Logic's trade secrets and intellectual property, including but not limited to IQ Connect, IQ Assessment and IQ Profit Management.

227.    As Chief Executive Officer, Mendicina had access to and regularly used a variety of confidential information, including information relating to IQ Logic accounts, business partners, customers, customer prospects, suppliers, supplier prospects, financial books and records, tax returns, sales pipeline information, receivables, trade secrets and intellectual property.

228.    After Mendicina chose to leave his employment with IQ Logic in August 2017, Mendicina had ongoing duties and restrictive covenants not to use for his own benefit or disclose to third persons IQ Logic's trade secrets or other confidential information.

229.    Even if there were no valid and enforceable agreements between IQ Logic and Mendicina, which there are, and even if IQ Logic's confidential and proprietary information were not trade secrets within the meaning of DTSA and the Illinois Trade Secrets Act, which they are, Mendicina is liable for breaching fiduciary duties owed to IQ Logic.

230.    After leaving IQ Logic, Mendicina breached his fiduciary duties when he made unauthorized use of IQ Logic's confidential information by disclosing IQ Logic's trade secrets, and confidential and proprietary information, to Kingsbridge and the public.

47

231.     As a direct and proximate result of Mendicina's breach of his fiduciary duties, IQ Logic has suffered, and continues to suffer, damages, including the loss of the inherent value of IQ Logic's trade secrets and confidential and proprietary information.  As a direct and proximate result of Mendicina's conduct, Mendicina also has been unjustly enriched, in that he has achieved his current position at Kingsbridge Technologies through the unauthorized use of IQ Logic's confidential information.  IQ Logic is entitled to damages for its actual losses and disgorgement of Mendicina's unjust enrichment.

232.     Although IQ Logic is entitled to damage to compensate it for the harm it already has suffered, for the reasons set forth above, these damages will not provide an adequate remedy at law for ongoing future breaches of Mendicina's fiduciary duties to IQ Logic.  IQ Logic is threatened with additional and ongoing injuries, including loss of profits, loss of market advantage, and loss of the inherent value of its confidential information, unless Mendicina is enjoined and restrained by an order of this Court.  IQ Logic is entitled to an order requiring Mendicina to purge IQ Logic's trade secrets and other confidential information, and Kingsbridge Technologies' knock-offs of same, and enjoining Mendicina from any further use or disclosure of that information and any further breach of his fiduciary duties.

### SIXTEENTH CAUSE OF ACTION
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

### (IQ LOGIC v. KINGSBRIDGE)

233.     Plaintiff IQ Logic incorporates the foregoing allegations as if fully re-alleged and restated herein.

234.     After termination of Mendicina's employment with IQ Logic in August 2017, Mendicina had ongoing fiduciary duties not to use for his own benefit or disclose to third persons IQ Logic's trade secrets or other confidential information.

235. Mendicina breached those duties by disclosing and using IQ Logic's confidential information, including but not limited to IQ Connect, IQ Assessment and IQ Profit Management, for the development of such confidential information by Kingsbridge Technologies, and by disclosing IQ Logic's trade secrets and confidential information to the public.

236. Kingsbridge knowingly participated in the breach by receiving and misusing the trade secrets and confidential information that Mendicina misappropriated. Kingsbridge has used and continues to use that information in the development of its business and operations, and to exploit that information for its own commercial advantage.

237. Kingsbridge has used IQ Logic's trade secrets and confidential information to improve its business and operations, thereby realizing increased revenue and profits.

238. As a direct and proximate result of Kingsbridge's participation in Mendicina's breach of his fiduciary duties, IQ Logic has suffered, and continues to suffer, damages, including the loss of the inherent value of the trade secrets and confidential information. As a direct and proximate result of Kingsbridge's conduct, Kingsbridge also has been unjustly enriched. IQ Logic is entitled to damages for its actual losses and disgorgement of Kingsbridge's unjust enrichment, including revenue and investment capital attributable to the use of IQ Logic's trade secrets and confidential information and promotion of that use to potential investors, including but not limited to TZP Capital.

239. Although IQ Logic is entitled to damages, disgorgement, and/or a reasonable royalty to compensate it for the harm it already has suffered, for the reasons set forth above, these damages will not provide an adequate remedy at law for ongoing future breaches of Mendicina's fiduciary duties to IQ Logic, and Kingsbridge's participation therein. Unless Kingsbridge is enjoined and restrained by an order of this Court, IQ Logic is threatened with

additional and ongoing injuries, including loss of profits, loss of market advantage, and loss of the inherent value of its confidential information.  IQ Logic is entitled to an order requiring Kingsbridge to purge IQ Logic's trade secrets and confidential information, and enjoining Kingsbridge from any further use or disclosure of that information and any further breach of Mendicina's fiduciary duties.

<div align="center">

**SEVENTEENTH CAUSE OF ACTION**
**CIVIL CONSPIRACY**

**(IQ LOGIC AND IQL-RIGGIG v. KINGSBRIDGE AND MENDICINA)**

</div>

240.    Plaintiffs IQ Logic and IQL-RIGGIG incorporate the foregoing allegations as if fully re-alleged and restated herein.

241.    Before Mendicina's resignation with IQ Logic and before his official employment with Kingsbridge, Mendicina and Kingsbridge were in active communications and engaged in an agreement for the unlawful purpose of acquiring, converting, and tortiously interfering with IQ Logic's entire business, including its trade secrets, executives, employees, accounts, books and records, sales pipeline, customers, contracts, business partners, receivables, intellectual property, and goodwill.

242.    On information and belief, Mendicina and Kingsbridge knowingly and voluntarily engaged in communications while Mendicina was employed at IQ Logic, which resulted in a joint scheme and agreement with the purpose of unlawfully interfering with the business operations of IQ Logic.  Kingsbridge and Mendicina carried out their scheme by various unlawful means, including but not limited to the theft and misappropriation of IQ Logic's trade secrets and intellectual property and tortiously interfering with IQ Logic's contracts and business expectancies.

243. Kingsbridge's multiple overt, tortious, and unlawful actions that interfered with IQ Logic's contracts and business expectations with its customers, as described herein, were committed in furtherance of the joint scheme and agreement that Kingsbridge entered into with Mendicina prior to his official employment with Kingsbridge and prior to his resignation from IQ Logic. Those actions include, but are not limited to, tortiously interfering with IQ Logic's business relationships and business expectancies with its customers, and tortiously interfering with the IQ Logic Operating Agreement and Mendicina Employment Agreement.

244. As a direct and proximate result of the civil conspiracy and Kingsbridge's tortious actions of interfering with IQ Logic's contracts and business expectations in furtherance of the civil conspiracy, Plaintiff IQ Logic was harmed and suffered loss of profits, loss of market advantage, and loss of the inherent value of its confidential information.

245. The civil conspiracy and Kingsbridge's actions in furtherance thereof caused, and continues to cause, immediate and irreparable harm and injury to Plaintiff IQ Logic for which there is no adequate remedy at law in addition to causing lost sales and profits and other intangible economic injuries for which Plaintiff IQ Logic is entitled to monetary and equitable relief.

246. As a direct and proximate result of the civil conspiracy and Kingsbridge's tortious actions of interfering with IQ Logic's contracts and business expectations in furtherance on the civil conspiracy, Plaintiff IQL-RIGGIG was harmed and suffered loss of its equity interest and monetary investment in IQ Logic, for which Plaintiff IQL-RIGGIG is entitled to monetary relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests the following relief:

A.      Entry of judgment against Defendants awarding damages in excess of $75,000 to Plaintiffs for each and every cause of action prayed by them herein;

B.      A grant of a permanent injunction in Plaintiff IQ Logic's favor enjoining business activities—including the use, development, sourcing and marketing—for any programs, products or services of Defendant Kingsbridge that incorporate, use or embody IQ Logic's trade secrets and other intellectual property;

C.      Imposition of a constructive trust for the benefit of Plaintiff IQ Logic as a vehicle for disgorgement of all monies, profits and gains Defendants have obtained or will unjustly obtain in the future at the expense of Plaintiff IQ Logic;

D.      A grant of a permanent injunction to eliminate the unfair advantage Defendants gained by using IQ Logic's trade secrets and other intellectual property and, more specifically, (i) an order that Defendants return to Plaintiff IQ Logic any and all confidential documents and information that they received, obtained, took, or transferred from IQ Logic (electronically or otherwise); (ii) an order that Defendants provide a sworn written certification, under penalty of perjury, stating that Defendants have returned to IQ Logic all copies and versions of any documents containing IQ Logic confidential information or that embody IQ Logic's trade secrets and other intellectual property in their possession, custody or control; (iii) an order prohibiting Defendants from reentering the market for the offending products or services for a period specified by the Court; (iv) an order that Defendants refrain from selling their existing inventory of any offending products or services; (v) an order for a procedure for contacting customers and removing the products and a certification of the same; and (vi) an order for a procedure for inspecting Defendants' premises and any electronic devices, including personal computers, laptops, desktops, iPads or similar tablet devices, smartphones and other hand-held devices that

52

are, or have been, in the possession, custody and control of Defendants, to identify IQ Logic's trade secrets and other intellectual property and confidential information and ensure that they are no longer used by Defendants;

E.      An award of a reasonable royalty to Plaintiff IQ Logic for the profits Kingsbridge has made from the use of IQ Logic's trade secrets and confidential information, pursuant to 18 U.S.C. § 1836(b)(3)(B), or as otherwise provided by law, in an amount to be proven at or after trial;

F.      An award of compensatory, exemplary and punitive damages to Plaintiff IQ Logic pursuant to 18 U.S.C. § 1836(b)(3)(B), and the Illinois Trade Secrets Act, or as otherwise permitted by law, in an amount to be proven at trial;

G.      An award of expenses, costs and attorneys' fees to Plaintiff IQ Logic under the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/10a(c), the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS/510/3, or as otherwise provided by law;

H.      An award of damages to Plaintiff IQL-RIGGIG for the loss of its equity interest and monetary investment in IQ Logic and related consequential damages;

I.      An award to Plaintiffs of pre-judgment interest, post-judgment interest, and costs of Court, to the extent permitted by law; and

J.      Such other and further relief as the Court deems just and proper.


## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable by a jury.

Respectfully submitted,

/s/ *Matthew S. Ryan*_____
Matthew S. Ryan, Bar No. 6278362
Cotsirilos, Tighe, Streicker, Poulos &
Campbell, Ltd.
33 North Dearborn Street, Suite 600
Chicago, IL 60602
(312) 263-0345
mryan@cotsiriloslaw.com

*Counsel for Plaintiffs*

NELSON MULLINS RILEY & SCARBOROUGH, LLP

Raymond G. Mullady, Jr. (admitted *pro hac vice*)
Philip M. Busman (admitted *pro hac vice*)
101 Constitution Avenue, N.W., Suite 900
Washington, D.C. 20001
(202) 689-2800

Lindsay L. Builder (admitted *pro hac vice*)
Katie E. Towery (admitted *pro hac vice*)
104 S. Main Street, Suite 900
Greenville, S.C. 29601
(864) 373-2300

*Counsel for Plaintiffs*

Dated: June 11, 2020