**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Got Docs, LLC d/b/a IQL Logic and IQL-RIGGIG, LLC, | |
| *Plaintiffs,* | |
| v. | |
| Kingsbridge Holdings, LLC, Frank Mendicina, and AMF6 Solutions, LLC, | No. 19 CV 6155 |
| *Defendants,* | Judge Lindsay C. Jenkins |
| _____ | |
| Kingsbridge Holdings, LLC, Frank Mendicina, and AMF6 Solutions, LLC, | |
| *Counterclaim Plaintiffs,* | |
| v. | |
| IQL RIGGIG, LLC (formerly known as Riveria MCS, LLC), Edward Gibson, and Tarang Gupta, | |
| *Counterclaim Defendants.* | |
| _____ | |

**MEMORANDUM OPINION AND ORDER**

Got Docs, LLC, d/b/a IQ Logic ("Got Docs") and IQL-RIGGIG, LLC, formerly known as Riveria MCS, LLC ("Riveria") filed this lawsuit against Kingsbridge Holdings, LLC ("Kingsbridge"), AMF6 Solutions LLC ("AMF6"), and Frank Mendicina ("Mendicina"), the sole member of AMF6. Plaintiffs allege that after leaving the employment of Got Docs, Mendicina joined Kingsbridge and stole Got Docs's business, including its clients, contracts, proprietary information, and employees. The decision to file the lawsuit was made by two of Got Docs's managers,

1

Tarang Gupta ("Gupta") and Edward Gibson ("Gibson") (collectively "Riveria Managers"). Mendicina and AMF6 ("Mendicina") also bring counterclaims against Got Docs, IQL-RIGGIG, and the Riveria Managers. Mendicina seeks a declaration that AMF6, not Riveria, owns Got Docs (Count I). He also brings claims for unauthorized filing and prosecution of this lawsuit (Count II), and breach of contract, gross negligence, and willful misconduct (Count III). [See Dkt. 217 at 72-92.] Currently before the Court are Mendicina's motion for summary judgment on Count I of his counterclaims [Dkt. 326], and Riveria's cross-motion for summary judgment on Counts I and II of Mendicina's counterclaims [Dkt. 332.] The Riveria Managers have also sought leave to supplement their statement of undisputed materials facts [Dkt. 349], which is opposed [see Dkt. 355].

For the reasons that follow, Mendicina's motion for summary judgment is granted. [Dkt. 326]. The Riveria Managers' motion for summary judgment is denied as to Count One of Mendicina's counterclaims and is granted as to Count Two of Mendicina's counterclaims. [Dkt. 332.]. Riveria Managers' motion for leave to supplement their statement of undisputed materials facts is denied in part and granted in part, as further explained below.

## I.     Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying

2

disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). A party that fails to comply with Local Rule 56.1 does so at their own peril. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) (District courts possess "broad discretion to require strict compliance with Local Rule 56.1").

### A.    Unsworn Declarations from Riveria, Gibson and Gupta

The parties here have filed several 56.1 statements between the cross motions for summary judgment. Mendicina filed his Local Rule 56.1(a)(2) statement in support of his motion, [Dkt. 330], to which the Riveria Managers responded. [Dkt. 336.] Likewise, the Riveria Managers filed their Local Rule 56.1(a)(2) statement, [Dkt. 334], in support of their motion, and Mendicina responded. [Dkt. 341.][1]

Mendicina objects to the Riveria Managers' use of three unsworn declarations from Riveria, [Dkt. 131-2], Gibson, [Dkt. 131-3], and Gupta, [Dkt. 131-4], to support and dispute facts in the 56.1 statements. The Riveria Managers rely on these declarations, signed on September 9, 2020, to support their positions related to various corporate actions and outcomes, including that Gibson and Gupta did not

---

[1]    Mendicina also filed a statement of additional facts under Local Rule 56.1(b)(3), [Dkt. 343], which included a single additional fact related to Gibson and Gupta's efforts to obtain litigation financing for this case. Gibson and Gupta failed to respond, so this fact is deemed admitted. *Cracco*, 559 F.3d at 632.

resign as managers of Got Docs, and that Riveria did not forfeit its membership interest in Got Docs. *Id.*; *see also* [Dkt. 334 ¶¶ 21-22, 29, 34-36; Dkt. 337 at 5.] The declarations are neither sworn nor made "under penalty of perjury." *Id.* Mendicina argues that these failures preclude the Court from considering the declarations at summary judgment. [Dkt. 339 at 13, n.5.] He is correct.

Under 28 U.S.C. § 1746, an unsworn statement can only have the effect of a sworn statement where the declarant agrees to subject himself to the "penalty of perjury." "An affidavit that does not subject the declarant to the penalties for perjury is not within the range of evidence that a district court may consider" at summary judgment. *Price v. Federal Bureau of Prisons*, 2022 WL 972294, at *4–5 (N.D. Ill. Mar. 31, 2022) (citing *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2 457, 471 (7th Cir. 1990); *see also Sheikh v. Grant Reg'l Health Ctr.*, 769 F.3d 549, 551 (7th Cir. 2014) (a declaration must "compl[y] with the formalities required by 28 U.S.C. § 1746" to be considered on summary judgment). This is because a declarant is "putting himself at risk" by subjecting himself to perjury, thereby giving the court assurances that the information contained within the declaration is reliable. *Hudson v. Preckwinkle*, 2015 WL 1541787, at *13 (N.D. Ill. Mar. 31, 2015).

The Riveria Managers have not provided a reason for why these declarations—each of which was signed more than three years ago—should be considered on summary judgment. And while the Riveria Managers respond to Mendicina's arguments that their Rule 56.1 statements are inadequate (and filed a motion to supplement them) they are conspicuously silent on the declarations and do not

request an opportunity to cure these deficiencies. [*See* Dkt. 348 at 7; Dkt. 349.] The Court will not consider the declarations in ruling on the pending motions for summary judgment.

## B. Riveria Managers' Motion to Supplement

The Riveria Managers have moved to supplement their statement of facts (*i.e.*, Dkt. 334) to include eight additional facts cited to in their briefing, which Mendicina opposes. [Dkt. 349, 355.] Mendicina is correct to note that Local Rule 56.1 does not contemplate a supplemental statement of facts and that it is within a Court's discretion to demand strict compliance with the rule. [Dkt. 355 at 1-2.] But it is also true that the purpose of Local Rule 56.1 is to ensure "the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination", [*id.* at 1], and that the Court prefers to decide cases on their merits. *Jackson v. Humana Ins. Co.*, 2023 WL 2207632, at *2 (7th Cir. Feb. 24, 2023).

The Riveria Managers provided citations in the briefing for all the supplemental facts, many of which were used in previous summary judgment filings. Moreover, many of the supplemental facts are citations to written documents that speak for themselves. Consequently, the Court will consider the text of the documents cited by the Riveria Managers except for Fact 51, which is based solely on the stricken Gibson Declaration. The Court will also consider Mendicina's responses to these facts

5

as laid out in their opposition, [Dkt. 55] and presumes that Mendicina otherwise disputes all characterizations of the supplemental facts.[2]

## II. Background

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits, [Dkts. 330, 334, 336, 341, 343, 349], as well as from the Court's earlier summary judgment opinions in this case [Dkts. 193, 309], and from prior party admissions [Dkt. 250]. These facts are undisputed except where a dispute is noted.

### a. Got Docs

Got Docs was founded in 2012 by AMF6 and Mendicina, who is the sole member of AMF6. [Dkt. 309 at 2.] Got Docs was an authorized Xerox dealer that primarily sold Xerox print devices and service and supplies using Xerox's MPS System. [*Id.*]

On November 18, 2015, the membership and ownership of Got Docs changed when Riveria[3], and AMF6 entered into an Amended and Restated Limited Liability Company Agreement of Got Docs, LLC ("Operating Agreement"). The Operating Agreement is governed by Nevada law. [Dkt. 309 at 2; Dkt. 431 ¶ 2; Dkt. 131-1 (copy

---

[2]     Because the Court presumes all supplemental facts are disputed, they will only help the Riveria Managers defend against summary judgment.

[3]     Riveria has had the following seven members: (1) Gibson, who has owned 52.3% of Riveria since June 2017; (2) Riveria Stone Falls LLC (which is owned 100% by Gupta), which has owned 20.5% of Riveria since June 2017; (3) Prakash Gupta, who has owned 1.8% of Riveria since June 2017; (4) Reshma Kabani, who has owned 2.3% of Riveria since June 2017; (5) Shaan Goswami, who has owned 9.2% of Riveria since June 2017; (6) Phil Mause, who has owned 4.6% of Riveria since June 2017; and (7) Shared Towers FL, LLC (which is owned 100% by Kamal Doshi) has owned 9.2% of Riveria since June 2017. [Dkt. 336 ¶ 3.] Riveria has two managers: Gibson and Riveria Stone Falls LLC (which is 100% owned by Gupta). [*Id.* ¶ 4.]

6

of the Operating Agreement).] Upon execution of the Operating Agreement, Riveria became a Member and 60% owner of Got Docs. AMF6 retained its Membership and the remaining 40% ownership interest. Got Docs's Managers and Board of Managers consisted of Mendicina, Gibson, and Gupta. [Dkt. 309 at 2.] At the same time, Mendicina was named Chief Executive Officer of Got Docs and entered into an employment agreement with Got Docs ("Employment Agreement"). [*Id.*]

      b. **Operating Agreement**

The Operating Agreement contains several terms relevant to this lawsuit, and in particular, the rights and obligations of Managers and Members. Section 6.1 sets out the "General Powers of the Board of Managers": "The business and affairs of the Company shall be managed by or under the direction of the Board of Managers.... Except for situations in which approval of the Members or a subset thereof is expressly required by this Agreement or by nonwaivable provisions of the Act, the Board of Managers shall have full, exclusive, and complete discretion, power, and authority, subject to any other provisions of this Agreement, to manage the business and affairs of the Company, and to make all significant decisions affecting such business and affairs." [Dkt. 336 ¶ 13.] Pursuant to Section 6.2, "Each Manager shall hold office until his or her successor is designated or until his or her earlier death, disability, resignation or removal." [Dkt. 341 ¶ 14.]

Section 6.6(a) requires "all activities or transactions of the Company whatsoever must be approved by a majority of Managers on the Board of Managers to constitute a valid act and binding obligation of the Company." [Dkt. 131-1 at 18.]

Section 6.4, which is the only section that addresses the resignation of a Manager, provides that "Any Manager may resign at any time upon written notice to the Company at the Company's principal office." [Dkt. 341 ¶¶ 15-16.] Section 6.5, which is the only section that addresses the removal of Managers, provides: "Any Manager may be removed, at any time and for any reason, by a Majority Vote of the Members." [Dkt. 341 ¶¶ 17-18.]

Section 5.3 of the Operating Agreement establishes how a Member of Got Docs can resign or withdraw from Got Docs: "Other than in connection with the Transfer of all of a Member's Membership Interest, a Member may not resign or withdraw from membership in the Company or withdraw its interest in the capital of the Company." [Dkt. 341 ¶ 27.] Section 6.13 concerns "Member Dissociation":

> In the event of death, disability, resignation, removal or termination of a Manager or of an officer (the 'Departed Person'), should a Majority Vote of the Members not elect to fill the Manager vacancy, or should the Board of Managers not appoint a successor officer, then the Members who are not Affiliates of the Departed Person may elect on Majority Vote to dissociate the Members who are Affiliates of the Departed Person and expel such Members from the Company in accordance with Section 9.4 below.

[Dkt. 131-1 at 20.] The Operating Agreement does not contain a "Section 9.4." [Dkt. 336 ¶ 49.] According to Gibson and Gupta, this is a "typographical error" that was an "obvious intended reference" to "Section 9.5, which governs the dissociation, expulsion and sale of a Member's Units pursuant to Section 6.13." [*Id.*] Mendicina argues in contrast that Section 6.13 "has no effect" because there is no Section 9.4. [Dkt. 341 ¶ 28.] Section 9.5(a) provides:

> If a Majority Vote of Members approve dissociation, expulsion and the sale of a Member's Units pursuant to Section 6.13 above (an "Approved Sale"), then each Member shall vote for, consent to and raise no objections against an Approved Sale. In connection with such Approved Sale, (i) each Member holding Units shall waive all dissenters' rights, appraisal rights or similar rights in connection with such Approved Sale, if any, and (ii) each Member required to sell is [sic] Units in such Approved [sic] shall sell all of his, her or its Units and rights to acquire Units on the terms and conditions approved by the Board of Managers. Each Member holding Units shall take all necessary or desirable actions in connection with the consummation of such Approved Sale, including the execution of all agreements and instruments, as requested by the Board of Managers. In such an Approved Sale, the selling Member shall be entitled to receive fair market value in consideration for its Units sold, including any goodwill that may exist therewith.

[Dkt. 250 ¶ 63.]

Section 3.1 of the Operating Agreement provides that "[a]ny Units that are forfeited by a Member pursuant to the terms of any agreement between the Company and such Member shall be deemed to have been reacquired by the Company." [Dkt. 341 ¶ 30.]

### c. **Corporate Formalities at Got Docs**

The parties disagree as to whether Got Docs adhered to corporate formalities following the execution of the Operating Agreement. Relying on deposition testimony from the Riveria Managers, Mendicina argues that the testimony shows that Got Docs "did not follow corporate formalities, did not have formal meetings, did not have written notices of meetings, did not maintain minutes of any meetings, and did not formally vote on actions taken by Got Docs." [Dkt. 336 ¶ 15.] Conversely, the Riveria Managers posit that the exact same deposition testimony cited by Mendicina establishes that "the Board of Managers regularly met, both via telephone call and in

person" and that neither Mr. Gibson nor Mr. Gupta could precisely recall whether Got Docs kept formal records. [*Id.*]

### d. Got Docs Ceases Operations and Files Tax Returns

On August 10, 2017, Gibson told Mendicina that Got Docs was "at a stand still in terms of paying people or making any progress." [Dkt. 309 at 2]. The next day, Mendicina resigned in writing as chief executive officer and manager of Got Docs. [*Id.*] This left Got Docs with two managers: Gupta and Gibson. [*See* Dkt. 193 at 3.] In the fall of 2017, Got Docs failed to pay Xerox for servicing and supplies it provided to Got Docs's customers on behalf of Got Docs.

As Got Docs began to fail, the Riveria Managers communicated with each other and their certified public accountant Jeff Rogers ("Rogers") about how to minimize their tax liability, maximize their tax losses, and obtain the best possible tax situation. [*See* Dkt. 336 ¶ 17.] Rogers prepared tax returns for Got Docs and Riveria and rendered tax advice to Got Docs, Riveria, Gibson, and Gupta. [*Id.* ¶ 16.] On October 5, 2017, Gupta sent an email to Gibson stating:

> Spoke with Jeff Rogers this morning.
>
> We need to convert our debt to equity (asap) so we can get the tax loses [sic] for IQ [Got Docs]. We can do it via a journal entry. Also – would like to send him 4k in advance so he can have cash to do our 2017 return (and we can get the losses).
>
> Is that okay with you?

[Dkt. 250 ¶ 23.] Later that day, Gibson replied to Gupta with the following plan for Got Docs:

> Given our situation here is what I suggest:

Hire an advisor to minimize personal liability.

Change the agent for notice in CA/NV to Frank [Mendicina].

Layoff Kat [a Got Docs employee].

Reduce Brian / Oscar / Robin [three Got Docs employees] to 1/2 time.

Leave Melanie [a Got Docs employee] as is.

Do not lease new space.

If we stop paying lease buyouts that should get us to break even.

Approach Frank [Mendicina] with a deal "If you can talk Kingsbridge into buying our service annuity for $x, we will drop the suit."

Basically have them buy selected assets.

If we can not strike a deal with Frank / Kingsbridge by 10/24, do one final billing. Don't pay Xerox.

What do you think?

[*Id.* ¶ 17.] On October 11, 2017, Gupta sent an email to Gibson stating: "Meant to bring this up on the call as well. I think we should send the money to Jeff so he can make sure we have the best taxable situation for ourselves here." [*Id.* ¶ 24.]

In November 2017, Xerox stopped providing service and supplies to Got Docs's customers. [Dkt. 309 at 2.] On November 28, 2017, Gibson filed a statement of information with the California Secretary of State stating that Mendicina was the only manager of Got Docs. [Dkt. 336 ¶ 22.] The Riveria Managers claim that this was done in error. [*See id.*]

On December 13, 2017, Gupta sent an email to Rogers stating: "We are shutting down IQ Logic." [Dkt. 250 ¶ 21.] Got Docs ceased operations in late 2017. [Dkt. 336 ¶ 24.] On January 11, 2018, Rogers sent Gupta an email stating:

The following is a summary of our discussion:

1. In order to maximize your losses from Got Docs you should convert the Riveria MSC [sic] LLC debt to equity as soon as possible. If you want to take the loss in 2017 you should make the conversion effective in 2017.

2. You cannot take the losses until you have disposed of your interest. This could be Riveria MSC [sic] LLC giving up its interest in Got Docs or you giving up your interest in Riveria MSC [sic] LLC.

[Dkt. 250 ¶ 26.] Gupta forwarded Rogers's email to Gibson. *Id.* In mid-January 2018, Xerox terminated Got Docs as an authorized dealer. [Dkt. 309 at 2.] On June 19, 2018, Gupta wrote an email to Rogers, stating:

Let's go ahead and finalize the tax returns for Got Docs (d/b/a IQ Logic) and the Riveria Entity that owns IQ Logic which is Riveria-MCS (issue subsequent K-1's). A few things to note:

1) Any payments Got Docs made to Riveria Group (me), should be debt repayment

2) Riveria-MCS can't forfeit ownership in Got Docs until end of 2018. We need to hold the former CEO liable for this [sic] 2018 actions

3) Our lawsuit is being filed in the next month. Riveria-MCS, is technically filing the lawsuit.

Let's do a sync-up whenever you are ready. I look to advice on when the investors will be able to write off their investment amounts. Ideally, would like to provide them such guidance when distributing the K-1's.

[Dkt. 250 ¶ 28.]

In September 2018, Riveria filed its 2017 federal and California tax returns. [Dkt. 336 ¶¶ 27-30; Dkt. 250 ¶¶ 29-30.] The federal tax return included the required K-1 statements issued to its owners/members, which included the Riveria Managers. [Dkt. 336 ¶ 27.] The K-1 statements stated, "The activity of this partnership [Riveria] is 100% derived from a California source. Please note that the partnership [Riveria] fully disposed of it's [sic] investment in Got Docs, LLC. Please consult your tax advisor regarding the deductibility of your share of these losses." [Dkt. 250 ¶ 29.] In the California tax return, Riveria stated that its sole investment had been in Got Docs (which was based in California) and that it was filing a final return because "The partnership [Riveria] no longer has any investments or activity in California." [Dkt. 250 ¶ 30.]

In May 2019, Riveria filed an amended 2017 federal tax return, with amended K-1 statements. [Dkt. 336 ¶ 31.] The amended K-1 statements stated: "The activity of this partnership [Riveria] is 100% derived from a California source. Please note that the partnership [Riveria] fully disposed of it's [sic] investment in Got Docs, LLC. Please consult your tax advisor regarding the deductibility of your share of these losses." [Dkt. 250 ¶ 31.] Riveria also filed an amended 2017 California tax return, in which Riveria stated that its sole investment had been in Got Docs (which was based in California) and that it was filing a final return because: "The partnership [Riveria] no longer has any investments or activity in California." [Dkt. 336 ¶ 34; Dkt. 250 ¶ 32.]

e. **Gibson Goes to Deloitte**

In 2017 and 2018, Gibson sought employment with Deloitte Consulting LLP ("Deloitte"). [Dkt. 336 ¶ 35.] In March 2018, Gibson represented to Deloitte that he had divested his interests in Riveria and Got Docs. [*Id.* ¶ 36.] On March 1, 2018, Gibson accepted the terms of a February 28, 2018 offer of employment from Deloitte, which stated: "This offer is contingent upon the following conditions having been met: ... (c) your having sold all of your direct and indirect equity interest in Riveria MCS LLC and Got Docs LLC (and your having provided Deloitte Consulting with written confirmation that such actions have been completed)." [*Id.* ¶ 37.] According to Gibson, the purpose of Deloitte's condition was to ensure that Gibson would not have any post-employment restrictions to which he may be bound that might impede his ability to work at Deloitte or perform services on behalf of Deloitte. [*Id.*]

On March 31, 2018, Gibson confirmed in a letter to Deloitte that he had completed these prerequisites for his employment and divested his interests in Riveria and Got Docs:

> Per the terms of my offer letter dated February 28, 2018, I have completed the prerequisites of employment that the firm requested including:
>
> - Dissolving Gibson Investment Group, INC
>   - The dissolution paperwork has been filed with the state
>   - Its Website and Facebook Pages are now inactive
> - Disposing of my direct and indirect interest in Riveria MCS, LLC and Got Docs LLC

14

Lastly, this document serves as my written confirmation that these actions have been completed.

[Dkt. 336 ¶ 38.] On March 26, 2018, Deloitte confirmed in an internal email:

Ed Gibson was Board approved in February and will be starting with us on 4/16. His offer letter included a contingency that he close out his previous company (Gibson Investment Group LLC) and divest of his direct and indirect interest from Riveria MSC [sic] LLC and Got Docs LLC. Attached is Ed's written confirmation that he has taken all the required actions necessary for him to be able to start.

[Dkt. 336 ¶ 39.]

In August 2019, Deloitte requested that Gibson "clarify the financial relationship between 'Riveria MCS, LLC' and 'Got Docs, LLC.'" [Dkt. 336 ¶ 41.] Gibson responded: "Riveria MCS, LLC was a holding company for [sic] that had a majority interest in Got Docs, LLC dba IQ Logic. IQ Logic ceased operations in late 2017. Riveria MCS has no other assets or activity." [*Id.*] Gibson attached to his email a partial copy of Riveria's amended 2017 K-1, which showed his $21,911 net long-term capital loss from Got Docs, as well as the statement, "Please note that the partnership [Riveria] fully disposed of it's [sic] investment in Got Docs, LLC." [Dkt. 336 ¶ 43.]

### f. **Mendicina Goes to Kingsbridge Technologies**

A few days after Mendicina left Got Docs in August 2017, Kingsbridge hired him to form a new division called Kingsbridge Technologies, through which Kingsbridge became an authorized Xerox dealer. [Dkt. 309 at 2.] After Got Docs ceased operations and had its phone service discontinued, Kingsbridge acquired Got Docs's former phone number. At some point after Mendicina joined Kingsbridge (the

date is disputed), Kingsbridge developed its own software interface called BridgeConnect. Between August 2017 (when Mendicina joined Kingsbridge) and December 2017 (when Got Docs ceased operations), Kingsbridge Technologies was just beginning operations and had no significant sales or revenues. [*Id.* at 2-3.]

Kingsbridge hired several Got Docs salespeople at various times between August and November 2017. [*Id.*] It is undisputed that after Got Docs and Xerox stopped providing service and supplies to Got Docs's customers, some of those customers contacted Kingsbridge, who attempted to provide those customers with service and supplies at Kingsbridge's expense and with no assurance of an ongoing relationship. [*Id.*] In late January 2018, Xerox formally allowed Kingsbridge to take over servicing Got Docs's customers who were willing to switch to Kingsbridge. [*Id.*]

g. **This Lawsuit and the Fallout**

Riveria filed suit against Kingsbridge on September 13, 2019, [Dkt. 1], but then amended their pleading on June 11, 2020, to add AMF6 and Mendicina as defendants. [Dkt. 63.] Plaintiffs (*i.e.*, the Riveria Managers) summarize their allegations as follows: "[t]his is a civil action for damages and injunctive relief arising from Defendants' theft of IQ Logic's entire managed document services business—its trade secrets, executives, employees, accounts, books and records, sales pipeline, customers, contracts, business partners, receivables, intellectual property, and goodwill—worth tens of millions of dollars." [Dkt. 317 at 2.] Since the lawsuit was filed, the parties have taken actions—purportedly on behalf of Got Docs—to exclude

16

the other from the company. Each side argues that the action taken by the other is invalid.

On February 28, 2020, Riveria signed a "Written Consent of the 60% Member of Got Docs, LLC" ("Written Consent") to remove Mendicina as a Manager and dissociate AMF6 as a Member. [Dkt. 336 ¶ 45; *see also id.* ¶ 47; Dkt. 131-5 at 13-16.] In the Written Consent, Riveria "approve[d] the sale of the Units that were held by AMF6 as an Approved Sale" to Riveria, "on terms and conditions to be approved by the Board of Managers pursuant to Section 9.5(a)" of the Operating Agreement. [Dkt. 250 ¶ 61; Dkt. 131-5 at 15.] The Written Consent further provides "that the Board of Managers [of Got Docs] shall approve the terms and conditions of an Approved Sale of all Units that were held by AMF6 to the undersigned [Riveria], including the fair market value that AMF6 shall be entitled to receive in consideration for such Units (including any goodwill that may exist therewith) in such Approved Sale, as set forth in Section 9.5 of the [Operating Agreement]." [*Id.* at ¶ 62.] Mendicina denies that there has ever been an "Approved Sale" of AMF6's units pursuant to Section 9.5 of the Operating Agreement and emphasizes that "AMF6 has not received anything, let alone fair market value," for its units. [Dkt. 336 ¶¶ 53-56.] The Riveria Managers maintain that this was because AMF6's units "had no fair market value as of December 31, 2018, when AMF was last a Member of Got Docs." [Dkt. 336 ¶ 56.]

According to AMF6 and Mendicina, they learned during discovery in this matter that Riveria had already disposed of and forfeited its ownership interest in Got Docs. [See Dkt. 336 at 17-19.] Based on this alleged discovery, on June 10, 2020,

Mendicina, on behalf of AMF6, accepted (or attempted to accept) Riveria's forfeiture (or purported forfeiture) of its ownership interest in Got Docs. [Dkt. 336 ¶ 45.] AMF6 also (purportedly) removed the Riveria Managers as Managers of Got Docs, in accordance with Section 6.5 of the Operating Agreement, which provides that "[a]ny Manager may be removed, at any time and for any reason, by a Majority Vote of the Members." [Dkt. 336 ¶ 46.] The Riveria Managers dispute that Riveria ever disposed of or forfeited its ownership interest in Got Docs, and that Mendicina's actions had any validity. [See Dkt. 336 at 17-19.]

On September 9, 2020, Riveria filed an amended 2017 federal and California income tax return. [Dkt. 341 ¶ 43.] Riveria's purpose for filing this amended return was to attempt to clarify that Riveria had not given up its state-law equity ownership interest in Got Docs when it sought to deduct its loss in Got Docs for tax purposes. [Dkt. 128 at 131.] Mendicina admits that Riveria filed the amended returns but denies that the amended returns supersede the impact of the initially filed, and first amended, tax returns. [Dkt. 341 ¶ 43.]

### h. **The Parties' Claims and Prior Rulings**

#### i. Got Docs and Riveria's Claims

In its governing Second Amended Complaint [Dkt. 63], Got Docs and IQL-RIGGIG assert seventeen claims: (1) tortious interference with contract; (2) tortious interference with prospective economic advantage; (3) breach of the Mendicina Employment Agreement; (4) tortious interference with the Mendicina Employment Agreement; (5) breach of the Got Docs Operating Agreement; (6) tortious interference

18

with the Got Docs Operating Agreement; (7) unfair competition under the Lanham Act; (8) violation of the Illinois Uniform Deceptive Trade Practices Act; (9) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; (10) trade secret misappropriation under the Defend Trade Secrets Act; (11) trade secret misappropriation under the Illinois Trade Secrets Act; (12) copyright infringement; (13) conversion; (14) unjust enrichment; (15) breach of fiduciary duty; (16) aiding and abetting breach of fiduciary duty; and (17) civil conspiracy. Riveria joins in Counts 13 (conversion) and 17 (civil conspiracy). Got Docs seeks damages of at least $15.6 million, injunctive relief, imposition of a constructive trust for the benefit of Got Docs, a reasonable royalty to Got Docs pursuant to 18 U.S.C. § 1836(b)(3)(B), punitive damages, and attorney's fees. [*Id.*]

On February 17, 2023, the Court granted in part and denied in part Defendants' (Mendicina, Kingsbridge, AMF6) motion for summary judgment, which covered all Got Docs's claims. [Dkt. 309]. The Court granted summary judgment in favor of Defendants with respect to Got Docs's claims as they relate to the non-competition provision in the Mendicina Employment Agreement; with respect to Got Docs's conversion, unjust enrichment, and breach of fiduciary duty claims to the extent they are based on trade secrets or confidential information; and with respect to Got Docs's breach of fiduciary claim as to any conduct after Mendicina left Got

Docs's employment. Otherwise, the Court denied summary judgment. [Dkt. 317 at 4 (status report); Dkt. 309 (summary judgment opinion).]

## ii. **Kingsbridge's Counterclaims**

Kingsbridge obtained leave to file a counterclaim against Riveria and an additional counterclaim against the Riveria Managers for the unauthorized filing of this lawsuit on behalf of Got Docs. [Dkts. 118, 119.] The parties cross-moved for summary judgment on Kingsbridge's counterclaims. As the Court summarized the motions:

> Kingsbridge moves for summary judgment on its counterclaim that Riveria had no authority to initiate the instant lawsuit by Got Docs because Riveria had forfeited its ownership interest in Got Docs prior to the suit being filed. Kingsbridge asserts that it is implicit in Riveria having forfeited its ownership interest (assuming arguendo that it did so) that Gibson and Gupta are no longer managers of Got Docs and thus cannot have authorized suit on its behalf. Plaintiffs cross move for summary judgment on the unauthorized-filing counterclaim, contending that Riveria did not dispose of its ownership interest in Got Docs, but even assuming it did, Gibson and Gupta remained managers of Got Docs, and thus had authority to authorize suit.

[Dkt. 193 at 2.]

Kingsbridge's argument was:

> Gibson and Gupta's tenure as managers was entirely dependent on Riveria's tenure as an owner of Got Docs and ended when Riveria's tenure as an owner of Got Docs ended. Under Nevada law, which applies because Got Docs is a Nevada LLC, "management of a limited-liability company is vested in its members," Nev. Rev. Stat. § 86.291.1, and "[t]he members [of an LLC] can manage the LLC themselves or they can appoint a manager or group of managers to manage the company." [Nevada Revised Statutes] § 86.335.2 provides that "a member who resigns or withdraws ceases to be a member, has no voting rights and has no right to participate in the management of the company." *It is implicit in Section 86.335.2 that individuals who are appointed managers of an LLC (e.g., Gibson and Gupta) by a particular member of*

> the LLC (e.g., Riveria) are deemed to have resigned and cease to be
> managers *if that member subsequently ceases to be a member* (unless, of
> course, the remaining members of the LLC want those individuals to
> continue serving as managers). Otherwise, contrary to Section 86.335.2,
> the withdrawn member would effectively continue to participate in the
> management of the LLC through these individuals even though the
> withdrawn member no longer has any ownership interest in the LLC.

[Dkt. 193 at 3.] (emphasis in original).

The Court rejected Kingsbridge's argument. It assumed "arguendo" that Riveria forfeited its interest in Got Docs, and then considered whether, under Nevada law and the governing Operating Agreement, Riveria's forfeiture resulted in the Riveria Managers being "implicitly removed" as managers. [*Id.* at 4.] The Court explained that "[u]nder Nevada law, the Operating Agreement controls the management of a limited liability company." [*Id.*] The Operating Agreement provides that "[e]ach Manager shall hold office until his or her successor is designated or until his or her earlier death, disability, resignation or removal." [*Id.*] The Court concluded that, "[a]bsent any authority, the Court is unwilling to infer that Gibson and Gupta were implicitly removed as managers when Riveria forfeited its interest given that such a result is not expressly provided for in Nevada's limited liability statue." [*Id.*] The Court expressly "did not opine on the accuracy" of the facts Kingsbridge relied on "in support of its assertion that Riveria disposed of its interest in Got Docs." [*Id.*] That issue remains unresolved.

### iii. **Mendicina and AMF6's Counterclaims**

After the Court issued its opinion on Kingsbridge's counterclaims, Mendicina and AMF6 filed an answer to Plaintiff's second amended complaint, and asserted

counterclaims against Got Docs, IQL-RIGGIG (Riveria), Gibson, and Gupta for declaratory and injunctive relief as to the ownership of Got Docs (Count I), for the unauthorized filing and prosecution of this lawsuit (Count II), and for breach of contract, gross negligence, and willful misconduct (Count III). [*See* Dkt. 217 at 72-92 (Mendicina and AMF6's counterclaims).] Mendicina and AMF6's theory is that "[i]n the Fall of 2017, Gibson and Gupta, acting as Managers of Got Docs, devised a scheme to cease the operations of Got Docs, liquidate Got Docs's remaining assets, terminate their and Riveria's involvement with Got Docs, and maximize the tax benefits that they and Riveria's other owners/members could realize from the Got Docs losses." [Dkt. 217 at 74, ¶ 16.] They allege that Mendicina is Got Docs's sole manager because Riveria forfeited its interest in Got Docs as a matter of law. [*See* Dkt. 217 at 81, ¶¶ 49-50.] Mendicina and AMF6 seek a declaratory judgment that AMF6 owns 100% of Got Docs or, in the alternative, that AMF6 owns 40% of Got Docs; a declaratory judgment that Mendicina is the sole manager of Got Docs; injunctive relief; actual damages of at least $1.6 million; punitive damages; and attorney's fees. [*Id.* at 92.]

Mendicina has moved for summary judgment on Count I of his counterclaim, and the Riveria Managers have cross-moved for summary judgment on Counts I and II. The Court resolves these motions today.

## III.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). Where, as here, the parties have cross-moved for summary judgment, the Court is required to "'construe all inferences in favor of the party against whom the motion under consideration [was] made.'" *Ten Pas v. Lincoln Nat'l Life Ins. Co.*, 31 F.4th 541, 545 (7th Cir. 2022) (*quoting Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005)). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

23

bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## IV. Analysis

The central question raised by the parties' cross-motions for summary judgment is whether Riveria is still a Member of Got Docs, and thus entitled to control and pursue this litigation, or instead whether Riveria forfeited its ownership interest, making AMF6 the sole owner of Got Docs and the master (or at least ultimate beneficiary) of Got Docs's litigation. The parties also ask the Court to decide the current ownership structure of Got Docs at both the Member and Manager level.

### A. Riveria's Forfeiture of its Ownership Interest in Got Docs

#### 1. The Riveria Managers' Arguments

The Riveria Managers argue that the undisputed facts establish that Riveria never forfeited its ownership in Got Docs. Riveria could have forfeited its ownership in Got Docs only under Nevada law or pursuant to the Operating Agreement. [Dkt. 337 at 4.] Nevada law states a "member may not resign or withdraw as a member … before the dissolution and winding up of the company" unless otherwise provided in

"other applicable law, the articles of organization or the operating agreement." NEV. REV. STAT. § 86.331.

The Operating Agreement provides three ways a Member could lose its interest, but only Section 3.1 is at issue here. [*See* Dkt. 328 at 5.] Section 3.1 states "[a]ny [ownership] Units that are forfeited by a Member pursuant to the terms of any agreement between the Company and such Member shall be deemed to have been reacquired by the Company." [Dkt. 336 ¶ 12.] Sections 5.5 and 6.1 provide that Got Docs as an entity can only act through a majority of its Board of Managers, [Dkt. 341 ¶¶ 3-4], which undisputedly only included Gibson and Gupta once Mendicina resigned from Got Docs on August 11, 2017.[4] [Dkt. 193 at 3.] According to the Riveria Managers, then, summary judgment is proper because Mendicina has not produced any evidence establishing Riveria and Got Docs came to an agreement whereby Riveria would forfeit its entire ownership interest back to the company.[5] [Dkt. 333 at 7-9; Dkt. 337 at 5-7.]

The Court disagrees. Whether an agreement or contract exists under Nevada law is a question of fact for the jury. *Zap's Electrical, LLC v. Monarch Constr.*, 2023 WL 6962004, at *4 (D. Nev. Oct. 20, 2023); *Certified Fire Prot. Inc. v. Precision Constr.*, 238 P.3d 250, 255 (Nev. 2012). A valid contract requires an offer, acceptance, meeting of the minds and consideration. *Certified Fire Prot. Inc.*, 238 P.3d at 255. A meeting of the minds requires the contract's "essential terms" to be agreed upon,

---

[4]    It is also undisputed that at this time Gibson and Gupta owned a majority interest in, and were the sole managers of, Riveria. [Dkt. 336 ¶¶ 3-4.]

[5]    Gibson and Gupta rely heavily on the unsworn declarations the Court struck at the outset of this opinion to support their argument that no agreement existed.

where the identification of what is deemed essential "depends on the agreement and its context and also on the subsequent conduct of the parties." *Id.* Under Nevada law, "the terms of an implied contract are manifested by conduct rather than written words" but must be "founded upon an ascertainable agreement." *Smallman v. MGM Resorts Int'l*, 683 F.Supp.3d 1175, 1196 (D. Nev. 2022).

Based on the facts submitted by Mendicina, there is evidence from which a factfinder could conclude that Riveria and Got Docs reached an agreement whereby Riveria forfeited its entire ownership interest in Got Docs in exchange for a tax benefit for Riveria's members. Mendicina cites to a series of email communications between Gibson, Gupta and their accountant Rogers—the text of which is not disputed—that shows that the Riveria Managers sought to maximize for Riveria's members (including the Riveria Managers) the tax benefit of Got Docs ceasing operations. [Dkt. 336 ¶¶ 17-19, 21, 23-24.] Rogers advised Gupta that "to maximize your losses from Got Docs you should convert the Riveria MSC [sic] LLC debt to equity as soon as possible" but to realize the tax benefit "[y]ou cannot take the losses until you have disposed of your interest" in Got Docs. [*Id.* ¶ 25.] In an email on June 19, 2018, Gupta adopts Rogers's counsel and asks him to proceed with filing the tax returns, but admonished Rogers that "Riveria-MCS can't forfeit ownership in Got Docs until end of 2018." [*Id.* ¶ 26.]

Riveria's subsequent tax filings, made under penalty of perjury, also support this conclusion. Riveria's 2017 tax year K-1 statement sent to its members and included in its federal tax return stated that "the partnership [Riveria] fully disposed

of it's [sic] investment in Got Docs, LLC. Please consult your tax advisor regarding the deductibility of your share of the losses" [*Id.* ¶¶ 27-28.] In its 2017 California tax return, Riveria stated that it "no longer has any investments or activity in California." [*Id.* ¶ 30.] These statements were re-submitted in Riveria's amended 2017 tax returns, which were filed in May 2019. [*Id.* ¶¶ 31-34.] There is no qualifying language in these returns regarding a residual ownership interest.

Gibson's statements to Deloitte, the substance of which are not disputed, also support a conclusion that Riveria reached an agreement with Got Docs to forfeit its interest in the company. The terms of Deloitte's March 2018 employment offer to Gibson, which he accepted and explicitly confirmed, required him to sell "all of [his] direct and indirect equity interest in Riveria MCS LLC and Got Docs LLC." [*Id.* ¶¶ 37-38.] Several months later in August 2018, Gibson informed Deloitte that Riveria "had" a majority interest in Got Docs and substantiated his position by attaching Riveria's 2017 K-1 statement. [*Id.* ¶¶ 41-43.] None of these statements recognize any residual interest Gibson retained in Riveria or that Riveria retained in Got Docs.

While it is true that no written or formal agreement between Riveria and Got Docs exists, no formal agreement was necessary. There is no dispute that the Riveria Managers had the authority to bind both entities. [*See* Dkt. 193 at 3; Dkt. 336 ¶¶ 3-4; Dkt. 337 at 5-6.] The terms of any agreement between Riveria and Got Docs could therefore be both offered and accepted by Gibson and Gupta alone. Here, Mendicina has provided competent evidence where Riveria and/or its managers made representations—some under penalty of perjury—that it decided to "forfeit" its

ownership interest in Got Docs back to Got Docs in exchange for a tax benefit.[6] This is noteworthy because under the Operating Agreement, Riveria could forfeit its ownership interest by coming to "any" agreement with Got Docs. [*Id.* ¶ 36.] If Got Docs did not accept the attempted forfeiture, then Riveria could not unload its interest. And the only people who could accept Riveria's forfeiture were the Managers of Got Docs—Gibson and Gupta—who had already decided to pursue the tax benefit on behalf of Riveria after Got Docs ceased operations. The Riveria Managers' contention that Mendicina "has not even presented any communication between Riveria and Got Docs", [Dkt. 337 at 7], ignores the reality that the Riveria Managers controlled both entities and that an action taken on behalf of one entity can necessarily involve the other. Moreover, while the fact is disputed, Mendicina has provided some evidence that it was standard practice for Got Docs to eschew corporate formalities in favor of informal resolutions. [Dkt. 336 ¶ 15.] A reasonable jury could find under the circumstances that an agreement existed between Riveria and Got Docs, formal or otherwise. The Riveria Managers have not carried their burden of establishing that Riveria never forfeited its ownership interest in Got Docs. Their Motion for Summary Judgment on Mendicina's Count I is denied.

### 2. Mendicina's Arguments

Relying on the same evidence he used to defeat the Riveria Managers' Motion, Mendicina argues that summary judgment should be granted in his favor. [Dkt. 328

---

[6] Mendicina also provides evidence that Got Docs itself took some action with respect to the agreement when Gibson listed Mendicina as the only Manager on a Statement of Information filed with the California Secretary of State. [*Id.* ¶ 22.]

at 5-7.] But as just discussed, even apart from the declarations from Gibson, Gupta and Riveria, there are disputed issues of material fact as to whether Riveria entered into an agreement with Got Docs to forfeit its interest. The only way for Riveria to rid itself of its interest in Got Docs under the Operating Agreement was to enter into some form of an agreement with Got Docs. Mendicina has pointed to various pieces of evidence from which a reasonable jury could conclude that there was one. But as the Riveria Managers argue, Mendicina has not produced a written agreement between Riveria and Got Docs, or any other formal communication between the entities that explicitly discusses the forfeiture of Riveria's interest under Section 3.1. [Dkt. 337 at 6-7.]

Mendicina does not meaningfully dispute this posture. To be sure, the Riveria Managers have raised various facts that they contend demand a different interpretation of their conduct. For example, Gibson stated under oath multiple times in 2019 during his divorce proceedings—before this lawsuit commenced—that he still had an ownership interest in Riveria and that Riveria had an ownership interest in Got Docs. [Dkt. 337 at 8.] Mendicina argues that Gibson's contentions in the other case are "irrelevant", but they were undoubtedly made.[7] Riveria also filed an amended tax return on September 9, 2020, that purportedly clarifies the statements made in the earlier returns. [Dkt. 341 ¶ 43.] In sum, the record contains disputed

---

[7]        The Court also notes that in their depositions, which Mendicina incorporated by reference as part of his Local Rule 56.1 materials, [Dkt. 330-2, Dkt. 330-3], Gibson and Gupta deny that there was an agreement between Riveria and Got Docs for the former to forfeit its interest in the latter.

evidence on the existence of an agreement to forfeit, formal or otherwise. *Certified Fire Prot. Inc.*, 238 P.3d at 255.

### 3. Forfeiture as a Result of Riveria's Tax Returns

Mendicina makes a separate, more persuasive argument as to why summary judgment on the issue of forfeiture is proper: Riveria's members could not have received the tax benefit under the tax code unless Riveria forfeited its interest in Got Docs, and because it is not disputed that Riveria's members received the tax benefit, the doctrine of quasi-estoppel precludes the Riveria Managers as a matter of law from taking a position in this litigation inconsistent with Riveria's tax returns and receiving a windfall. [Dkt. 328 at 8-14.] Analysis of this argument requires an examination into Riveria's tax structure as well as tax law.

Both Got Docs and Riveria are taxed as partnerships. [Dkt. 131-1 at 11; Dkt. 336 ¶ 28.] Partnerships are passively taxed, meaning that the taxable income/loss flows directly to the partners and the partnership itself does not pay taxes. *Superior Trading, LLC v. Comm'r*, 728 F.3d 676, 678 (7th Cir. 2013); *see also Markell Co v. Comm'r*, 107 T.C.M. (CCH) 1447, *14 (2014) ("Partnerships do not pay taxes, but they do file information returns that their partners then use to calculate their own individual tax liability.") As discussed above, Gupta and Gibson wanted Rogers to provide them with the "best taxable situation" following Got Docs cessation of operations, which Rogers advised could not occur until Gupta "disposed of [his] interest" which could be accomplished by "Riveria MSC [sic] LLC giving up its interest in Got Docs or [Gupta] giving up [his] interest in Riveria MSC [sic] LLC." [Dkt. 336 ¶¶ 21, 23-25.] Gupta then instructed Rogers to prepare Riveria's tax return

but noted that Riveria "can't forfeit ownership in Got Docs until end of 2018." [*Id.* ¶ 26.] Riveria ultimately filed its 2017 tax return in September 2018, which stated Riveria "fully disposed of it's [sic] investment in Got Docs, LLC" and that Riveria was filing its final tax return because it "no longer has any investments or activity in California." [*Id.* ¶¶ 27-30.] These exact statements, all of which were given under penalty of perjury, remained in Riveria's first amended 2017 tax returns filed in May 2019. [*Id.* ¶¶ 31-34.]

According to Mendicina, there are only three possible provisions under the tax code—26 U.S.C. §§ 469, 731, and 165—that Rogers could have been referring to when he advised the Riveria Managers, all of which required Riveria to fully divest its ownership interest in Got Docs to receive the benefit. [Dkt. 328 at 8.] Mendicina admits he does not know which tax code provision(s) Rogers referred to in his email communications with Gibson and Gupta, [*id.*], and neither party presents facts establishing the basis for Rogers's initial advice. In response, the Riveria Managers do not point to other potentially applicable tax code provisions but argue that Riveria was not required to forfeit its equity interest in Got Docs in exchange for the tax benefit. [*See* Dkt. 337 at 9-12.] On Riveria's second amended 2017 tax returns (filed in September 2020), Riveria clarifies that it is taking its loss under Section 165 of the Internal Revenue Code. [Dkt. 128 at 131.] To evaluate Mendicina's estoppel argument, the Court must determine whether Riveria's members could

31

simultaneously reap the tax benefit provided by each provision while Riveria retained ownership in Got Docs.

### i. Section 469

Section 469 of the Internal Revenue Code prescribes how individuals and certain entities account for losses from passive activities. Passive activities are those that "involve[ ] the conduct of any trade or business" where "the taxpayer does not materially participate." 26 U.S.C. § 469(c). Material participation occurs when an individual regularly, continuously, and substantially contributes to the activity. 26 U.S.C. § 469(h). The standard rule under Section 469 is that a taxpayer can only offset losses from passive activities against gains from passive activities, with any unused loss from the passive activity carrying forward to the next year to be applied against future passive gains. 26 U.S.C. § 469(d)(f). The upshot is that a taxpayer would not be able to use a loss from a passive activity (*e.g.*, investment in an LLC) to deduct against taxable income from non-passive types of income (*e.g.*, wages). This rule changes, however, and losses from activities can be applied to non-passive income, when "the taxpayer disposes of his entire interest in" the passive activity through a fully taxable transaction. 26 U.S.C. § 469(g)(1); *Bilthouse v. U.S.*, 553 F.3d 513, 515 (7th Cir. 2009); *see also* 5 Mertens Law of Federal Income Taxation § 24C:3 (2008). A taxpayer cannot avail themselves of Section 469(g)(1) unless they have demonstrated there is no outstanding ownership interest in the passive activity. *Herwig v. Comm'r*,

107 T.C.M. (CCH) 1476, at *5 (2014); *Robison v. Comm'r*, 115 T.C.M. (CCH) 1501 (2018).

According to Mendicina, this structure demonstrates that Riveria forfeited its interest in Got Docs because otherwise "Riveria's passive owners could not invoke the benefits of Section 469(g)(1) if Riveria continued to have any ownership interest in Got Docs." [Dkt. 328 at 7-8.] This may be true as a general matter—the Riveria Managers do not respond to the argument—but it suffers from several flaws. First, this provision plainly does not apply to the Riveria Managers because they are not passive investors. By all accounts, as the active managers of Riveria and Got Docs (Riveria's sole investment), Gibson and Gupta ran the day-to-day business, [*see* Dkt. 336 ¶ 3], and their involvement was "regular, continuous and substantial." Under federal regulations, a taxpayer materially participates in an activity when, among other options, the "individual participates in the activity for more than 500 hours during such year." 26 C.F.R. § 1.469-5T(a)(1). Section 469 only applies to Riveria's remaining passive investors. [*Id.*]

Mendicina does not submit undisputed facts establishing Riveria's tax strategy involved benefitting the passive investors generally, let alone under Section 469(g)(1). In the communications discussing tax strategy, Rogers and Gibson/Gupta are seemingly concerned with getting themselves the best outcome. [Dkt. 336 ¶¶ 19, 21, 25-26]. At most, Gupta tells Rogers that he wants to be able to advise the passive Riveria investors as to when they "will be able to write off their investment amounts", [*id.* ¶ 26], which shows an intention for the passive investors to receive a tax

33

deduction but does not establish Riveria was specifically targeting Section 469(g). [*See* Dkt. 330 Ex. 12 at Rogers2973 (admonishing each member of Riveria in the tax returns to "consult your tax adviser regarding the deductibility of your share of these losses").] It is also clear by the structure of Section 469 that Riveria's passive investors could receive a tax benefit—subtracting the passive loss in Got Docs from any passive gains during the period—without Riveria forfeiting its ownership interest in Got Docs.

Mendicina's arguments under Section 469 are ultimately inconclusive. If Riveria disposed of its entire interest in Got Docs, then Riveria's passive investors could have taken advantage of Section 469(g)(1) to deduct the loss against non-passive income, thereby "maximizing" the tax benefit.[8] But there is no factual basis before the Court establishing (1) any passive investor relied on Section 469(g)(1) in their personal returns; or (2) that the Riveria Managers' tax strategy was driven by a desire to deliver this outcome to Riveria's passive investors. Moreover, the passive investors could receive some tax relief under Section 469 even if Riveria retained its ownership interest. 26 U.S.C. § 469(d)(f).

### ii.    Section 731

Mendicina next argues that Rogers's advice could have been based on a liquidation under 26 U.S.C. § 731(a)(2), which prescribes rules regarding partnership distributions. When a partnership makes a distribution to its partners, a partner is normally not permitted to recognize the loss, "except that upon a distribution in

---

[8]      This presumes that a taxpayer being able to apply losses from passive activities against non-passive gains in a given tax year is "maximizing" the tax benefit.

liquidation of a partner's interest in a partnership … loss shall be recognized to the extent of the excess of the adjusted basis of such partner's interest in the partnership." 26 U.S.C. § 731(a)(2). Liquidation of a partner's interest "means the termination of a partner's entire interest in a partnership by means of a distribution, or a series of distributions, to the partner by the partnership." 26 U.S.C. § 761(d). As with Section 469(g)(1), "entire interest" means what it says—to invoke the benefit, the partner must forfeit all interest, without qualification, in the partnership. *See Chase v. Comm'r*, 92 T.C. 874, 884 (1989) (holding that Section 731(a)(2) was inapplicable where partner did not terminate both his general and limited partnership interests); *Neubecker v. Comm'r*, 65 T.C. 577, 583 (1975) (holding Section 731(a)(2) inapplicable because partner did not terminate entire interest in partnership); *La Rue v. Comm'r*, 90 T.C. 465, 487 (1988) (partners terminated entire interest in partnership when they "no longer had an ownership interest in [its] business or assets"); *see also* 26 C.F.R. § 1.731-1(a)(2). Because a partner is required to forfeit his entire interest in the partnership to recognize a loss under this rule, Mendicina contends Riveria necessarily forfeited its interest in Got Docs.

The Riveria Managers respond by arguing that when Got Docs liquidated for tax purposes, it exchanged its assets with its Members' ownership interests for tax purposes only, so the statements on Riveria's tax returns were not inaccurate: "Essentially, the tax liquidation of Got Docs caused a liquidation for tax purposes of the ownership interests in Got Docs" but because "Got Docs had no assets to distribute to its members, what in effect occurred was a transfer of the ownership

interests for tax purposes of AMF6 and Riveria to Got Docs in exchange for no assets." [Dkt. 337 at 10.] As a result, Riveria's statement that it "fully disposed of its investment in Got Docs, LLC was not incorrect." [*Id.* at 10-11.]

To support this argument, the Riveria Managers cite to Section 4060.02 of the Tax Practice Series, which discusses the tax impact of a partnership's cessation of business activities. The chapter instructs that when business stops, "all partnership assets are treated as distributed to the partners on the date of termination, and the rules governing liquidating distributions apply." [*Id.*] "Liquidating distributions" refers to 26 U.S.C. § 731. *See e.g.,* Tax Practice Series § 4050.02.A (citing to Section 731(a)(2) to support conclusion that "distributee partner may recognize loss in the context of a liquidating distribution if the distribution consists solely of money, accounts receivable, and inventory and the fair market value of these distributed assets is less than the distributee partner's adjusted basis in his or her partnership interest.") But as explained above, Section 731(a)(2) does not distinguish between tax and equity ownership; a partner's *entire interest* must be extinguished.

The other materials cited by the Riveria Managers in support—an IRS Internal Revenue Ruling and IRS Private Letter Ruling—likewise fail to establish that there is a salient difference between divesting equitable ownership and ownership for tax purposes. Instead, the materials discuss either the mechanics of Section 731, or the creation of a new partnership. [Dkt. 333 at 12-13; Dkt. 337 at 10-11.] But none of these materials touch on whether Riveria could retain equity ownership in Got Docs after Got Docs liquidated for tax purposes, which is the argument Mendicina makes.

36

[Dkt. 328 at 10 (because Got Docs liquidated for tax purposes, "Riveria's owners could maximize their tax losses because Section 731(a)(2) allowed them to recognize as losses the remaining basis in their investment in Got Docs").] Rather, as the materials cited by the Riveria Managers acknowledge, there must be a "complete liquidation of their partnership interests." [Dkt. 337 at 10.] This makes sense. The structure of Section 731 prohibits a partner from recognizing a loss because the interest in the partnership could increase in the future. 26 U.S.C. § 731(a)(2). When there is a "termination of a partner's entire interest in a partnership", however, there is no possibility that the value of the partner's interest in the partnership will increase, and therefore deducting any loss is permissible because the loss is conclusively established.

Despite the apparent admission by the Riveria Managers that Got Docs "liquidate[d] for tax purposes", [Dkt. 337 at 10], it is not clear to the Court this is accurate. Under 26 U.S.C. § 708(b), an LLC (that is taxed as a partnership) is considered to terminate when "no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership." When that occurs, the Section 731 liquidation process is initiated. *See* Tax Practice Series § 4060.02.B. While it is undisputed that Got Docs ceased its business operations by the end of 2017, [Dkt. 336 ¶ 24], Got Docs did not necessarily terminate because it was still pursuing this lawsuit. [*See id.* ¶ 26 ("Riveria-MCS can't forfeit ownership in Got Docs until end of 2018. We need to hold the former CEO liable for his 2018 actions")]; *see also Harbor Cove Marina Ptnrs P'ship v. Comm'r*, 123 T.C. 64,

37

83 (2004) (holding that partnership had not terminated under Section 708(b) where the resolution of a pending lawsuit "could reasonably lead to the partnership's reporting in a subsequent year of significant income, credit, gain, loss, or deduction"). That is the case here. Got Docs's lawsuit was contemplated and pursued by the Riveria Managers before filing their tax returns, [*see e.g.,* Dkt. 343 ¶ 1], and there is no other undisputed evidence that establishes (1) Got Docs terminated as a partnership for tax purposes as a matter of law; or (2) that Riveria's members sought a benefit under Section 731 in their personal tax returns. Like with Section 469, then, Section 731 cannot conclusively support summary judgment on the issue of forfeiture, but to the extent the provision applies, it would require Riveria to forfeit its interest in Got Docs.

### iii.    Section 165

Section 165, which permits "as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise", is the final tax code provision raised by the parties. The Riveria Managers agree both in their briefing and in Riveria's most recent amended 2017 tax returns that Section 165(a) is applicable. [Dkt. 337 at 11-13.] More specifically, Riveria claims in its tax returns that it was allowed to take the deduction under 26 U.S.C. § 165(a) because the investment in Got Docs was worthless, [Dkt. 128 at 131], and their briefing states Riveria indeed received the benefit. [Dkt. 337 at 9.]

Before analyzing the contours of Section 165, the Court addresses Mendicina's argument that Section 165(a) cannot be used because a more specific provision, Section 731, governs. [Dkt. 328 at 10.] As explained above, the Court cannot

definitively conclude that Section 731 is the sole salient provision because there are not undisputed facts establishing that a liquidated distribution of Got Docs occurred. Even if it could, Mendicina ignores myriad cases where courts have found that a partner is permitted to rely on Section 165 to take a loss in a partnership interest under certain circumstances. *See e.g., Forlizzo v. Comm'r*, 116 T.C.M. (CCH) 231, *3 (2018) ("Pursuant to section 165(a), a taxpayer may claim an ordinary loss deduction relating to his investment in a partnership if the investment becomes worthless and sale or exchange treatment does not apply"); *MCM Inv. Mgmt., LLC v. Comm'r*, 118 T.C.M. (CCH) 437, at *9 (2019) ("under section 165(a) … a taxpayer may deduct a loss from an investment in a partnership if the partnership interest becomes worthless during the tax year"); *Corra Res., Ltd. v. Comm'r*, 945 F.2d 224, 226 (7th Cir. 1991) (analyzing whether taxpayer can use Section 165(a) to deduct loss in partnership interest); *Echols v. Comm'r*, 935 F.2d 703, 707 (5th Cir. 1991) (same). The Court now turns to the merits of whether Riveria could reap the benefits of Section 165(a) while retaining its ownership interest in Got Docs.

Section 165 is a generally applicable tax code provision regarding losses. "To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and … actually sustained during the taxable year." 26 C.F.R. § 1.165–1(b). A closed and completed transaction is normally accomplished through the sale of property but can also occur "if the taxpayer abandons the asset or the asset becomes worthless." *MCM Inv. Mgmt., LLC*, 118 T.C.M (CCH) 437 at *9 (citing *Tucker v. Comm'r*, 841 F.3d 1241, 1249 (11th Cir.

2016)). Abandonment and worthlessness are separate inquiries.[9] *Id.* Under either theory, though, the taxpayer must "irrevocably cut ties to the asset" through some action that is "visible to outside observers" to receive the deduction. *Cuthbertson v. Comm'r*, 119 T.C.M. (CCH) 1051, at *52 (2020) (quoting *Corra Res., Ltd. v. Comm'r*, 945 F.2d 224, 226 (7th Cir. 1991). For non-depreciable property, such as partnership ownership interests, deductions under Section 165(a) are permitted "in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein." 26 C.F.R. § 1.165-2(a); *see also United Dairy Farmers, Inc. v. U.S.*, 267 F.3d 510, 522 (6th Cir. 2001) ("in order for a loss of an intangible asset to be sustained and to be deductible, there must be (1) an intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment"); *Precision Pine & Timber, Inc. v. Comm'r*, 2003 WL 1113995, at *6 (T.C. 2003) ("the worthlessness test requires taxpayers to show a closed and completed transaction and an identifiable event evidencing the destruction of an asset's value. Assets may not be considered worthless, even when they have no liquidated value, if there is a reasonable hope and expectation that they will become valuable in the future").

Ultimately, if there is a "reasonable prospect of recovery" in value for the asset, then a taxpayer cannot take a deduction under Section 165. *See* 26 C.F.R. § 1.165-1(d)(2)(i)-(ii); *see also Comm'r v. McCarthy*, 129 F.2d 84, 87 (7th Cir. 1942) (a

---

[9] The Riveria Managers' citation to the following quote from *Precision Pine*, [Dkt. 337 at 12], makes the same point (and nothing more): "Taxpayers are entitled to take loss deductions under section 165 not only for assets that the taxpayer has abandoned, with or without their having become worthless, but also for assets that have become worthless, with or without having been abandoned." *Precision Pine & Timber, Inc. v. Comm'r*, 2003 WL 1113995, at *4 (T.C. 2003).

deduction under Section 165(a) should only be permitted where there is "a complete elimination of all value [in the asset], and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest in it.")

The rationale for Section 165(a) is well summarized in *Corra Res.*, a case on which Mendicina relies and the Riveria Managers ignore. In that case, a taxpayer attempted to use Section 165(a) to deduct losses from a worthless lease that he purportedly abandoned. *Corra Res., Ltd.*, 945 F.2d 224 at 226. The court disagreed with the taxpayer because he had not "taken any step to dissociate [himself] from the venture." *Id.* The Seventh Circuit affirmed that Section 165(a) was inapplicable because there was no "closed and completed transaction" that would prohibit the taxpayer from later benefitting from the asset: "Investors would love to hold onto an asset in the hope that it will pay off despite long odds, while retaining the option of taking a deduction if it does not … [but] a taxpayer may not hedge bets at the Treasury's expense." *Id.* A taxpayer must "cross[] the Rubicon" to deduct a loss under Section 165(a), because otherwise the taxpayer retains "the option to reap the benefits" from the asset if the situation improves. *Id.* at 226-227. That is why the taxpayer must take some action that publicizes his decision to divest from the asset, and why the taxpayer cannot seek to benefit from the asset later.

Other cases likewise demonstrate the strict requirement for the taxpayer to show that he cannot benefit from the asset in the future to apply a deduction under Section 165(a). *See e.g., Forlizzo v. Comm'r*, 116 T.C.M. (CCH) 231 (2018) (taxpayer

could not use Section 165(a) where partnership interest retained value); *MCM Inv. Mgmt., LLC*, 118 T.C.M (CCH) 437 (allowing Section 165(a) deduction where taxpayer claimed on tax return the asset was worthless and did not seek to use asset thereafter); *Cuthbertson*, 119 T.C.M. (CCH) 1051 (disallowing Section 165(a) deduction where taxpayer continued to benefit from the asset after purported abandonment because "[o]ne does not abandon an asset when he makes it available to his own entity for continued use.")

Based on the above, Mendicina contends that Riveria necessarily had to forfeit its ownership interest in Got Docs to seek a Section 165(a) deduction because otherwise Riveria would still have "ties" to the asset. [Dkt. 328 at 10-11.] Mendicina further argues that the Riveria Managers cannot simultaneously contend that (1) Riveria's ownership interest in Got Docs is worthless (and reap a tax benefit therefrom); but (2) Got Docs has a viable claim against Mendicina and Kingsbridge that is "worth tens of millions of dollars." [Dkt. 339 at 12-13.] Otherwise, as evidenced by this lawsuit, Riveria could use their ownership interest in Got Docs as both a shield and sword, which Section 165(a) and its implementing regulations do not permit. [*Id.*] Put differently, Riveria came to a fork in the road when Got Docs ceased operations— claim the ownership interest was worthless and recover the tax benefit *or* decide Got Docs had meritorious claims and pursue the lawsuit. [*Id.* at 15.] But when Riveria decided to "take an appropriate tax loss", [Dkt. 337 at 9], it made a binding choice.

Riveria filed tax returns stating that it "fully disposed of its investment in Got Docs, LLC", [Dkt. 336 ¶ 28], "no longer has any investments or activity in California",

[*id.* ¶ 30], and that its "interest in Got Docs became worthless by the end of 2017." [Dkt. 128 at 131.] These are "visible" actions by Riveria demonstrating their intentions to "cut ties" to the asset. Moreover, Riveria's ownership interest in Got Docs cannot be both worthless, as the Riveria Managers claimed, and worth tens of millions of dollars through the pursuit of this lawsuit. Indeed, as Mendicina notes, if the Riveria Managers were to succeed on the claims raised in their complaint, then Riveria's members would have received the tax deduction under Section 165(a) (or Section 469(g)(1)) *and* the gain from the increase in value of Riveria's ownership interest in Got Docs. [Dkt. 339 at 11-12.] That is the precise have-your-cake-and-eat-it-too conduct that Section 165(a) prohibits. *Corra Res., Ltd.*, 945 F.2d 224 at 226-227. To take the deduction, which Riveria does not dispute occurred, [Dkt. 337 at 9], Riveria had to cut ties to the asset—its interest in Got Docs.

The Riveria Managers' responses to Mendicina's arguments are unavailing. First, they seek to rely on 26 C.F.R. § 1.165-2(a), which states as follows:

> A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.

The Riveria Managers read this regulation to mean that "a loss can be taken on a discontinuation of business for tax purposes without an actual 'forfeiture' or 'abandonment' of the ownership interest for state law purposes." [Dkt. 337 at 11.]

While it is not entirely clear to the Court how the regulation supports their conclusion, to the extent they contend the last sentence obviates the need for the taxpayer to cut ties with the asset, the court in *Corra Res.* explicitly rejected that argument, finding that the language of 26 U.S.C. § 1.165-1(d) precluded that reading of the regulation. *Corra Res., Ltd.*, 945 F.2d 224 at 227.

The case that the Riveria Managers rely on for this proposition is also distinguishable. The court in *Echols* said "[t]he tax court, the government, and the Taxpayers are in unanimous agreement that there is no requirement that a taxpayer relinquish title to an asset in order to establish a loss if such loss is reasonably certain in fact and ascertainable in amount." *Echols v. Comm'r*, 935 F.2d 703, 706 (5th Cir. 1991). The quote is accurate, but the Riveria Managers misconstrue its meaning. The *Echols* case involved a taxpayer who sought to receive a Section 165(a) deduction for his investment loss (held through a partnership) in a piece of land that he attempted to abandon while the partnership still owned the land. *Id.* at 704-705. In analyzing whether the taxpayer properly abandoned the asset (or whether the asset was worthless), the court acknowledged that the fact the taxpayer still held title to the land did not foreclose his ability to seek a Section 165(a) deduction. *Id.* at 706.

But the *Echols* court was not saying the taxpayer could use the asset *after* obtaining a Section 165(a) deduction. Rather, the quote merely acknowledges that a taxpayer need not legally relinquish title to an asset *before* seeking a deduction under Section 165(a) if the taxpayer otherwise complies with the Section's requirements. This is the crucial distinction differentiating this case from *Echols;* the taxpayer in

44

*Echols* did not attempt to use the asset after receiving the Section 165(a) deduction, as Riveria seeks to do here. The ability to retain title in an asset is predicated on the loss being "reasonably certain in fact and ascertainable in amount", which cannot occur if there is a subsequent transaction with the asset because then it is not "closed and completed." 26 C.F.R. § 1.165–1(b). It does not, as the Riveria Managers contend, allow a party to eschew the Section's requirements to irrevocably cut ties to the asset after "Riveria wrote off its investment [in Got Docs] for tax purposes." [Dkt. 337 at 12.] *Echols* stands for the proposition that a taxpayer does not have to forfeit title before seeking a Section 165(a) deduction, but once that deduction is taken—once the asset is "permanently discarded from use"—the taxpayer cannot reclaim the asset. 26 C.F.R. § 1.165–2(a). The Riveria Managers have failed to point the Court to a single case or other authority where a taxpayer has been able to claim ownership or title to an asset (and thereafter benefit from its increase in value) for state law purposes after taking a Section 165(a) deduction for tax law purposes.

The purported distinction between ownership for state law purposes and tax law purposes is something the Riveria Managers repeatedly point to in their briefing, but they do not cite to competent authority establishing such a difference exists. [*See* Dkt. 333 at 14-15; Dkt. 337 at 11-12.] Regardless, the only ownership right a taxpayer can give up in exchange for a Section 165(a) reduction is the state law ownership right. *See United States v. Irvine*, 511 U.S. 224, 238 (1994) (there is a longstanding rule that while "state law creates legal interests and rights in property, federal law

determines whether and to what extent those interests will be taxed"). Consequently, there is no tax ownership interest in Got Docs for Riveria to lose.

The Riveria Managers call their inability to use an asset after receiving a Section 165(a) tax deduction "absurd", [Dkt. 348 at 2], but it is entirely sensible. Both the tax loss and the lawsuit are based on the same underlying asset, Riveria's ownership interest in Got Docs. If there is a "reasonable prospect of recovery" in the lawsuit against Mendicina and Kingsbridge, then the value of Riveria's interest in Got Docs—the business the Riveria Managers claim Mendicina destroyed—is the value of the lawsuit. But just because an asset's value temporarily diminishes does not permit the taxpayer to receive a Section 165(a) deduction. 26 C.F.R. § 1.165–1(d)(2)(ii) ("if the taxpayer's automobile is completely destroyed in 1961 as a result of the negligence of another person and there exists a reasonable prospect of recovery on a claim for the full value of the automobile against such person, the taxpayer does not sustain any loss until the taxable year in which the claim is adjudicated or otherwise settled.") Having decided to claim the tax benefit for its members, Riveria has forfeited its interest in the asset. Any other outcome would result in a windfall to Riveria's members. *Cuthbertson*, 119 T.C.M. (CCH) 1051 at *17 ("taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made.")

Riveria's most recent amended 2017 tax returns confirm the result. Riveria clarified the basis for its amendment as follows:

46

> Riveria's interest in Got Docs became worthless by the end of 2017, and Riveria is entitled to deduct a loss with respect to such interest under Section 165 of the Internal Revenue Code. The identifiable events include, but are not limited to ceasing all business activities in 2017, and Got Docs filing its final tax return. Riveria is writing off its tax loss pursuant to IRC Section 165, notwithstanding that it continued to own through 2017 and still owns in 2020 its ownership interest in Got Docs for state law purposes. See Treas. Reg. § 1.165-2(a) (allowing a loss even if the loss of title has not occurred).

[Dkt. 128 at 131.]

This verifies Riveria elected to cut ties to its "worthless" ownership interest in Got Docs by "writing [it] off" and taking the Section 165 deduction. This decision was not improper, but it has consequences. Riveria cannot now seek to transform the "worthless" asset into an asset worth "tens of millions of dollars." [Dkt. 1 ¶ 1]; *see also Corra Res., Ltd.,* 945 F.2d224 at 226 ("Perhaps Corra Resources would have returned a royalty check had one arrived" after the abandonment, but "[t]he Commissioner is entitled to more than the taxpayer's after-the-fact assurance that this is so.")

### 4. Quasi-Estoppel

Having determined that Riveria could not have received the tax benefit without "cutting ties" to its ownership interest in Got Docs, the Court must now determine whether, as Mendicina urges, the Riveria Managers are precluded as a

matter of law from arguing that Riveria did not forfeit its ownership interest in Got Docs under the Operating Agreement.[10] The Court concludes they are so barred.

Mendicina's argument under the related doctrines of quasi-estoppel and the "sham affidavit" rule is straightforward: Riveria made representations in its tax returns under penalty of perjury, received a benefit based on those representations, and cannot now take a position inconsistent with those statements in this litigation. [Dkt. 328 at 11-13]. The Riveria Managers respond by saying that (i) Riveria's tax returns are consistent with its continued ownership interest in Got Docs, so quasi-estoppel is inapplicable; (ii) quasi-estoppel should not be employed at the summary judgment stage; and (iii) the doctrine of unclean hands prevents Mendicina from relying on an equitable doctrine. [Dkt. 337 at 13]. The Court has already rejected the first argument but will examine the remaining two.

The basic principle of quasi-estoppel is that a party cannot make an assertion that is plainly inconsistent with a prior position taken under oath, including tax returns. *Gibson v. Chubb Nat'l Ins. Co.*, 601 F. Supp. 3d 288, 297 (N.D. Ill. 2022) (quasi-estoppel bars a party "from taking a position contrary to that which they have asserted in their tax returns"); *see also Zip Dee, Inc. v. Dometic Corp.*, 931 F. Supp. 602, 618 (N.D. Ill. 1996) (statutory estoppel requires a party to show "(1) assertion by a party of entitlement to statutory right or privilege; (2) the receipt by that party of an actual benefit pursuant to the statute; [and] (3) subsequent assertion by that party

---

[10]    Section 5.2(g) of the parties' Operating Agreement states "general equity principles (regardless of whether considered at law or equity" are applicable in construing the Operating Agreement. [Dkt. 131-1 at 14.]

which is inconsistent with entitlement to the statutory benefit previously received"). The rationale for this rule is that a "party should not be 'allowed to accept the benefits of a transaction or statute and then subsequently take an inconsistent position to avoid the corresponding obligations or effects.'" *Gibson*, 601 F. Supp. 3d at 297 (quoting *Central States, Southeast & Southwest Areas Pension Fund v. One Stop, Inc.*, 2007 WL 7705585, at *13 (N.D. Ill. July 18, 2007) *see also Matter of Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991) (quasi-estoppel "forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects.").

Quasi-estoppel is only appropriate "where the party has accepted a tax benefit based on its assertions in its tax returns." *Gibson*, 601 F. Supp. 3d at 298; *see also Central States*, 2007 WL 7705585, at *13 ("[a]fter accepting the tax benefits, One Stop cannot now disavow those very same tax returns.") If the statement in the tax return cannot be tied to a benefit, however, then quasi-estoppel does not apply. *Chi. Reg'l Council of Carpenters Pension Fund v. United Carpet, Inc.*, 2020 WL 3077541, at *4 (N.D. Ill. June 10, 2020) (quasi-estoppel not applicable where "it is not clear what benefit Defendants received from the tax returns.") The Seventh Circuit's sham-affidavit rule serves the same purpose as quasi-estoppel. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (materials that contradict "a statement made under penalty

of perjury, even if the statement was not made in the course of litigation" are not considered at summary judgment).

The Court concludes quasi-estoppel/the sham affidavit rule is applicable here. The Riveria Managers do not dispute the statements made in Riveria's tax returns that Riveria "fully disposed of its investment in Got Docs, LLC" and Riveria "no longer has any investments or activity in California." [Dkt. 336 ¶¶ 28, 30.] They also admit that Riveria's members received a tax benefit from these returns, and the benefit stems from Section 165(a). [Dkt. 128 at 131; Dkt. 337 at 9.] Crucially, and as more fulsomely explained above, Riveria could not have received the tax benefit under Section 165(a) (or Section 469(g)(1) or Section 731(a)(2)) without deciding to "irrevocably cut ties" with the asset. *Corra Res., Ltd.,* 945 F.2d 224 at 226. To allow the Riveria Managers to now argue that Riveria did not forfeit its ownership interest in Got Docs despite already receiving the tax benefit would necessarily contradict the basis for Riveria's members receiving the benefit. *Central States*, 2007 WL 7705585, at *13 ("[u]nder the doctrine of quasi-estoppel, a party is not allowed to accept the benefits of a transaction or statute and then subsequently take an inconsistent position to avoid the corresponding obligations or effects"); *Cuthbertson*, 119 T.C.M. (CCH) 1051 at *17 ("taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made.")

Here, the truth of one statement precludes the truthfulness of the other. *Dep't of Transp., State of Ill. v. Coe*, 445 N.E.2d 506, 508 (1983) (estoppel is appropriate

where the two statements are "totally inconsistent—the truth of one must necessarily preclude the truth of the other"). No reasonable jury could interpret Riveria's representation that it "fully disposed of" its "worthless" investment in Got Docs as consistent with Riveria retaining its ownership interest in Got Docs. Consequently, there is no need for the fact finder to weigh evidence or determine credibility regarding the statements, as the Riveria Managers argue. [*Id.* at 13-15.]

### 5. Unclean Hands

The Court next considers Riveria's argument that quasi-estoppel should not be applied because Mendicina has "unclean hands". [Dkt. 337 at 17-18.] The Riveria Managers claim Mendicina's "bad acts directly relate to Riveria's decision to write off its investment in Got Docs for tax purposes" and that he and Kingsbridge "are entirely responsible for Got Docs becoming a defunct business entity." [*Id.* at 18.] While it is within the court's discretion "in refusing to aid the unclean litigant", *Packers Trading Co. v. Commodity Futures Trading Com.*, 972 F.2d 144, 149 (7th Cir. 1992), the Court declines to use that discretion, where, as here, the equitable doctrine stems from a decision that the Riveria Managers made after Mendicina's alleged conduct with full knowledge of its consequences.

According to the Riveria Managers, Mendicina and Kingsbridge conspired to steal Got Docs's "business and destroyed the value of the company and Riveria's investment." [Dkt. 337 at 9]. It is not disputed, however, that the Riveria Managers were aware of Mendicina and Kingsbridge's alleged wrongdoing almost immediately after Mendicina left the company in August 2017. [*See* Dkt. 336 ¶ 20 (email from Gibson to Gupta on October 5, 2017, contemplating suing Mendicina and

Kingsbridge); Dkt. 343 ¶ 1 (the Riveria Managers retained counsel before filing tax returns).] After consulting with a tax advisor, and aware that Mendicina's "bad acts" had potential value in the form of a lawsuit by Riveria against Mendicina and others, Riveria elected to file the tax returns fully disposing of its investment in Got Docs so that its members would receive "an appropriate tax loss." [Dkt. 337 at 9.] Given these circumstances, the Court declines to apply the doctrine of unclean hands.

Mendicina's motion for summary judgment on its counterclaim for a declaratory judgment on the issue of Riveria's forfeited interest in Got Docs is granted.

This finding has several noteworthy ramifications for the litigation. First, a necessary corollary to the Court's conclusion that Riveria has forfeited its interest in Got Docs is that AMF6 is the sole remaining member in Got Docs and has been since Riveria filed its initial 2017 tax returns in September 2018. Because Riveria was no longer a Member after September 2018, it could not have dissociated AMF6 under Section 6.13 of the Operating Agreement. [Dkt. 131-1 at 20 ("the *Members* who are not Affiliates of the Departed Person may elect on Majority Vote to dissociate the Members…").] The Riveria Managers' "Written Consent" is therefore invalid. Conversely, Mendicina's Third Declaration on behalf of AMF6 affirmatively removed

Gibson and Gupta as Managers of Got Docs as of June 10, 2022, pursuant to Section 6.5 of the Operating Agreement, which permits Members to remove Managers.

## B.  Riveria Managers' Motion for Summary Judgment on Count II

Still outstanding is the Riveria Managers' motion for summary judgment on Count II of Mendicina's counterclaim for the unauthorized filing and prosecution of this lawsuit. The Court grants the motion as to Count II.

In its prior Order from February 2021, the Court held that regardless of whether Riveria forfeited its membership interest in Got Docs, Gibson and Gupta were still Managers of Got Docs because neither Nevada law nor the Operating Agreement supported the conclusion that a Manager is automatically removed from positions of authority when the Member that elected the Manager ceases to own the entity. [Dkt. 193.] The Court concluded as a result that "Gibson and Gupta were authorized to file the instant lawsuit." [*Id.* at 4.] This same logic applies to Mendicina's counterclaim as it does to Kingsbridge's, which is nearly identical. [Dkt. 333 at 6-7.]

The result of these rulings is that between September 2018 and June 2020, Got Docs was owned entirely by AMF6 but managed by Gibson and Gupta. While a somewhat awkward posture, there is nothing improper with this result. As a consequence, when this lawsuit was filed in September 2019, Gibson and Gupta were still the Managers of Got Docs because AMF6 had not yet taken action pursuant to Section 6.5 of the Operating Agreement to remove them. And pursuant to Sections 6.1, 6.6 and 6.9 of the Operating Agreement, Gibson and Gupta had the authority to act on Got Docs's behalf—including by filing this lawsuit—without Member approval.

[Dkt. 341 ¶ 6.] While the Court finds today that Gibson and Gupta lost their authority to prosecute this lawsuit on Got Docs's behalf when AMF6 removed them as Managers of Got Docs on June 10, 2020, [Dkt. 330-22], they were authorized to file it in 2019. This sinks Mendicina's claim for "unauthorized filing" of the lawsuit. *See Eul v. Transworld Sys.*, 2017 WL 1178537, at *21 (N.D. Ill. Mar. 30, 2017) ("a claim for 'unauthorized filing' … seeks redress against those who set our judicial system in motion where there is no litigant seeking to enforce a right" (quoting *Safeway Ins. Co. v. Spinak*, 641 N.E.2d 834, 836 (Ill App. Ct. 1994)). Summary judgment is granted in favor of the Riveria Managers on Count II of Mendicina's counterclaim.

## IV.    Conclusion

As to AMF6 and Mendicina's counterclaims, AMF6's motion for summary judgment is granted as to Count One. [Dkt. 326]. Riveria's motion for summary judgment is denied as to Count One and granted as to Count Two. [Dkt. 332.]. Riveria's motion for leave to supplement the statement of undisputed materials facts is denied in part and granted in part. [Dkt. 349.]

Enter: 19-cv-6155
Date:  December 8, 2023

_____
Lindsay C. Jenkins
United States District Judge